**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**
**CASE NO. 3:22-cr-115-TJC-JBT**

**UNITED STATES OF AMERICA**

v.

**GREGORY EDWARD MCLEAN**

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

**COMES NOW**, the Defendant, **GREGORY EDWARD MCLEAN** ("Defendant" or "Mr. McLean"), by and through his undersigned counsel, and hereby submits his Sentencing Memorandum for this Honorable Court's consideration in support of a five-year prison sentence, as required by the minimum mandatories that apply under the Federal Sentencing Guidelines.

## INTRODUCTION

Mr. McLean will appear before this Honorable Court on May 30, 2024, to be sentenced on one count of production of a visual depiction, the production of which involved the use of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1); and one count of unlawful retention of national defense information, in violation of 18 U.S.C.A. § 793(e). The minimum term of imprisonment is five (5) years; and the maximum term of imprisonment is thirty (30) years and fine of $500,000.00 dollars.

On December 6, 2023, pursuant to a Plea Agreement with the United States Attorney's Office, Mr. McLean plead guilty to all counts with the understanding that he

would receive a prison sentence of five (5) years, up to the guideline sentence, and that the Government has agreed to recommend that the Court impose concurrent sentences for Counts One and Two. *See Plea Agreement,* between the United States of America and Gregory McLean (December 6, 2023), attached hereto as **"Exhibit A."** Thus, Defendant respectfully requests this Court order a sentence that departs downward from the advisory guideline range sentence recommended by the United States Probation Office, downward from the Government's recommendation, and sentence the Defendant to five years in federal prison, followed by a period of supervised release.

## BACKGROUND

**Childhood and Family Information.** Mr. McLean (who is currently forty (40) years old) was born in on the United States military installation in Guantanamo Bay, Cuba, on December 28, 1983, to his mother, Barbara Moyer (who is currently sixty-four (64) years old), and his father, James McLean (who is currently sixty-five (65) years old). Though his parents were married at the time Mr. McLean was born, they subsequently divorced when he was eight (8) years old and proceeded to date each other for the following fifteen (15) years.

Though Mr. McLean's parents dated for several years after their divorce, both parents eventually married other people. Mr. McLean's father married Julee Rountree Sharrow, who worked as an office manager and served as Mr. McLean's step-mother until her death in 2021. From this marriage, Mr. McLean also gained a step-sister, Stephanie Sharrow (who is currently forty-two (42) years old), though he has not maintained a relationship with her. Similarly, Mr. McLean's mother married Randall

Moyer, who worked for Blue Cross and Blue Shield and served as Mr. McLean's step-father until his death in 2012. Following Mr. Moyer's death, Mr. McLean's mother subsequently married Brian Hicks and the couple are currently residing in Kentucky.

Though Mr. McLean was able to maintain loving supportive relationships with both of his parents throughout their divorce and future relationships, following the divorce, he was often left home alone and describes this period of his life as being lonely. Thus, in an effort to find friendship and support, Mr. McLean became involved in scouting. According to his father, Mr. McLean was "driven for success with natural leadership abilities," which helped him excel through the ranks and serve as a pack leader in Cub Scouts, as well as a Troop Leader in Boy Scouts. *See*, James McLean, Character Letter, attached hereto as "**Exhibit B**".

Despite his success in scouting, while speaking with Irish Anderson in preparation of his Presentence Investigation Report, Mr. McLean described his childhood upbringing as "a very rough time". *See* Irish Anderson, *Amended Pre-Sentence Investigation Report*, U.S. Probation Office, Mar. 11, 2024, at 19, which has been attached hereto as "**Exhibit C**." Specifically, Mr. McLean described an incident that occurred when he was just three (3) years old, in which he had sexual contact with a neighbor. *Id.* Additionally, Mr. McLean reported that he discovered pornography at age eight (8) when he was spending the weekend at his father's home (post-divorce from his mother). *Id.*, at 18. Upon discovering his father's pornography, Mr. McLean consistently sought out and viewed pornographic material, which developed an addiction that persisted until his arrest. *Id.* In fact, after finding his father's porn, Mr. McLean's sexual curiosity became so consuming

that he started experimenting with his step-sister at age eleven (11) or twelve (12). Looking back, Mr. McLean describes these adverse childhood experiences as plague that has followed him throughout his life and contributed to his involvement to the allegations made in Count 1. *Id.*, at 19.

While Mr. McLean's parents were shocked by the news of his current charges and convictions, they continue to standby and support him. In fact, in some regards, Mr. McLean's arrest has revitalized his relationship with his parents, where they only spoke once or twice a year prior to his arrest, compared to the weekly calls that they've maintained since his arrest. *Id.*, at 18.

**Education.**  Though Mr. McLean began elementary school on the standard academic track, this was quickly derailed by his parents' divorce, which devastated Mr. McLean. During this time, Mr. McLean's parents fight for custody became so contentious that Mr. McLean was kidnapped by his father, which caused him to miss most of the second-grade school year and required him to repeat the grade the following year. Despite this set back, Mr. McLean was placed into the gifted program in fourth grade and proceeded with the standard academic track throughout middle and high school.

While Mr. McLean had managed to get his academics back on track, he continued to struggle with the social aspects of school. As an adolescent, Mr. McLean was very shy and self-conscious, which made it difficult to make friends. Though Mr. McLean attempted to make friends by participating in the school's drama and ROTC program, he continued to have difficulties socializing and was even suspended for fighting. However,

4

things began to change for the better when Mr. McLean reached his junior year of high school, as he committed to a vigorous training schedule, lost one hundred pounds, and gained the self-confidence he so desperately needed.

Nevertheless, in 2002, Mr. McLean graduated from Andrew Jackson High School, located in Jacksonville, Florida. Following graduation, Mr. McLean attended Florida State University, where he obtained a bachelor's degree in Information Science in 2006 and earned an overall GPA of 3.18.

At the time of Mr. McLean's arrest in this case, he was actively enrolled in the Naval War College, located in Rhode Island, where he was working to complete his joint military educational requirements. Though Mr. McLean understands he will serve a substantial prison sentence for this case, he remains eager to further his education and hopes to earn a counseling degree during his incarceration.

In fact, since Mr. McLean's transfer to the Nassau County Detention Center, he has taken advantage of the few programs and educational opportunities that are available to him. In doing so, Mr. McLean has invested seventy-three hours of course work towards the completion of fourteen courses, including but not limited to: PTSD for Veterans; Lessons for Christian Living; Concepts in Biblical Interpretation Part 1; Foundations of Biblical Interpretation; A Guide Through the 12 Steps of Recovery; and Rising Strong: A Substance Abuse Recovery Course. *See*, Course Information and Certificates of Completion, attached hereto as "**Exhibit D**".

**Employment History.** Though Mr. McLean has a history of being hyper critical of himself, one thing he's always been proud of is his work ethic. Eager to join the

workforce and gain financial independence, throughout high school, Mr. McLean worked at several establishments such as Dominos, Papa John's, and UPS. Upon graduating from college in 2006, Mr. McLean decided to join the Navy branch of the military, which quickly became his life's passion.

Thus, Mr. McLean spent the next sixteen (16) years working tirelessly to advance his career and move up the ranks. Initially, upon enlisting in 2006, Mr. McLean began working as an electrical and auxiliary officer. Where Mr. McLean was quick to demonstrate his hard work and dedication, it wasn't long before he was promoted to work as a training officer aboard the destroyer squadron, DESRON-2.

As Mr. McLean continued to excel through the ranks, he was deployed to Iraq for the first time in 2008, where he served as a civil affairs officer. Upon returning from Iraq in 2010, Mr. McLean was promoted to operational test director of the advanced military weapons systems for the Navy's Test and Evaluation Force. Mr. McLean served in this capacity for three years before he was promoted to chief engineer of the USS Taylor in 2014. Having demonstrated his ability to act as a leader on the USS Taylor, the following year, Mr. McLean was promoted to operations officer of the USS Souix City. Mr. McLean served in this capacity until 2018, at which point he was deployed to Iraq for the second time, where he served as the director of training for the U.S. Embassy. Following his deployment, Mr. McLean spent the following two years serving as the seamanship director for a float train group in Mayport, Florida.

By 2020, Mr. McLean had worked his way up the ranks and served as the executive and commanding officer on the XO Minneapolis St. Paul and was stationed at

Naval Station Mayport, Florida. Furthermore, prior to his arrest, Mr. McLean was actively enrolled in the Naval War College, located in Rhode Island, where he was working to complete his joint military educational requirements. At the time of his arrest, Mr. McLean's position was that of a Lieutenant Commander. However, since his arrest, Mr. McLean has been placed on "furlough without pay" and he anticipates that he will be discharged from the Navy after sentencing. Such discharge will be devastating for Mr. McLean, as he has dedicated the last sixteen years of his life to his career in the Navy, during which he earned numerous awards, including but not limited to the following: Navy Achievement Medal (x5); Navy Accommodation Medal (x3); Army Accommodation Medal; Joint Accommodation Medal; Global War on Terrorism Medal; Operation Iraqi Freedom Medal; Operation Inherent Resolve Medal; and the Global War on Terror Expeditionary Medal.

**Mental and Emotional Health.** Given his childhood trauma and experiences in the military, it's no surprise Mr. McLean's mental health has been substantially affected. For instance, while speaking with Irish Anderson about his involvement in Count 1, Mr. McLean advised that his conduct was a coping mechanism and a distraction from thinking about "things I've seen and experienced" as a child and while in the Navy. *See,* Exhibit C at 20. Moreover, as it pertains to the trauma he experienced in the Navy, Mr. McLean told Ms. Anderson that during his first tour in Iraq, he "made decisions that continue to impact my mental health." *Id.*

Though Mr. McLean did not attend any counseling or therapy sessions prior to his arrest, he has met with mental health professionals at the Nassau County jail several

7

times and has found such sessions to be helpful. Furthermore, while speaking with such professionals, Mr. McLean reported that he was diagnosed with Post-Traumatic Stress Disorder (PTSD) while in the Navy, and that he suffers from hypervigilance and awakes from nightmares at least twice per week. *See*, Exhibit C, at 20. Since his arrest, Mr. McLean has also grappled with anxiety and depression, as this case and its resolution weigh heavily on his mind and conscience. Thus, medical professionals at the jail prescribed Mr. McLean an anti-depression, Cymbalta, which he has been taking since January 2024. *Id.* Furthermore, Mr. McLean understands that his conviction of Count 1 will subject him to sexual offender mental health treatment, which he is amenable to completing.

**Financials.**   Prior to his arrest, Mr. McLean was earning approximately $10,800 a month working for the Navy. *See*, Exhibit C, at 21. However, as of the filing of this Memorandum, Mr. McLean's only assets are his 2005 Ford-250 (valued at $2,621), and his family home (valued at $322,935). *Id.* Thus, Mr. McLean does not have the present ability to pay a fine or restitution ordered by the Court, though he could participate in the Federal Bureau of Prison's Inmate Financial Responsibility Program and adhere to a nominal payment schedule while serving his sentence. *Id.*

**Substance Abuse History.**   Though Mr. McLean does not have a substantial history with substance abuse, there is evidence that he was introduced to alcohol at an early age and that he began drinking at the age of seventeen (17). While Mr. McLean's consumption during his early twenties was typical, he began drinking to excess at age twenty-eight (28). Unfortunately, his consumption only progressed with his age, as he

attempted to offset the stress of working in the Navy by drinking heavily at home. This continued until his arrest, at which point he was averaging half-to-a-full bottle of whiskey every day.

Moreover, upon his arrest, Mr. McLean provided a urine sample which yielded negative results for the presence of illicit substances. *See*, Exhibit C, at 20. Such results are consistent with Mr. McLean's assertion that he has never abused illicit substances. Nevertheless, Mr. McLean is amenable to substance abuse treatment, as it may assist with his alcohol abuse.

**Marriage**.  On September 9, 2006, Mr. McLean married his first wife, Deanna Marie Perkins in Clay County, Florida. The two subsequently divorced in February 2009 without having any children and have not maintained contact with one another.

Mr. McLean subsequently married Cynthia Sigler (who is currently forty-two (42) years old) on June 13, 2015, in Duval County, Florida. The couple do not have any children. Though Cynthia initially stood by and supported Mr. McLean following his arrest, she recently expressed her intent to file for divorce.

**Additional Mitigation.**   Multiple family members and friends have written character letters on Mr. McLean's behalf.  These letters will be sent to the Court ahead of Mr. McLean's sentencing hearing. Furthermore, since his confinement, Mr. McLean has found great solace in religion and is now a preacher, leading weekly church services at the jail. *See*, Exhibit C, at 20. Mr. McLean intends to continue this practice throughout his sentence and hopes to start a church upon his release. *Id*. at 21.

## ARGUMENT IN FAVOR OF A FIVE-YEAR SENTENCE

Mr. McLean respectfully requests this Honorable Court consider the statutory mitigating factors in imposing the applicable five-year minimum mandatory prison sentence. Given the unique set of facts and circumstances that surround this case, undersigned counsel respectfully requests this Court to give Mr. McLean's case a unique review for sentencing purposes.

## FEDERAL SENTENCING PROCEDURE

A District Judge must first: (I) calculate the applicable sentencing Guidelines range; (II) allow both parties to present arguments in favor of what they believe to be the appropriate sentence; (III) consider all of the factors enumerated in § 3553(a), and clearly document the court's reasoning for the sentence it hands down. *Gall v. U.S.*, 552 U.S. 38, 53 (2007). If this procedure is followed, the only remaining question for appellate review is whether the sentence was "reasonable." *Id.* at 56. In reviewing whether a sentence is "reasonable," when it is outside of the Guidelines range, "appellate courts may therefore, take the degree of variance into account and consider the extent of a deviation from the Guidelines. [The court] reject[s], however, an appellate rule that requires 'extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47.

## I.    ADVISORY GUIDELINES AND MAXIMUM SENTENCE

The advisory guideline imprisonment sentence is 151 months to 188 months (or 12.5 years to 15.6 years), based upon Mr. McLean's total offense level of 34 and criminal history category of I. Mr. McLean is facing a maximum sentence of thirty (30) years imprisonment.

As indicated in the Presentence Investigation Report ("PSI"), the base offense level and enhancements assessed to Mr. McLean under §§2G2.2 and 2G3.3 are as follows:

**Count One:** Distribution of a Visual Depiction, the Production of which Involved the Use of a Minor Engaging in Sexually Explicit Conduct (Victim 1) [18 U.S.C. § 2252(a)(2)]

Base Offense Level: Distribution of a Visual Depiction, the Production of which Involved the Use of a Minor Engaging in Sexually Explicit Conduct 18 U.S.C. § 2251(a)(2) – U.S.S.G §2G2.2(a)(2)

**22**

Specific Offense Characteristics: The distributed materials involved a prepubescent minor or a minor who had not attained the age of 12 years. [U.S.S.G § 2G2.2(b)(2)]

**+2**

Specific Offense Characteristics: The distributed materials were uploaded using Kik. [U.S.S.G § 2G2.2(b)(3)(F)]

**+2**

Special Offense Characteristics: The offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler. [U.S.S.G §2G2.2(b)(4)(A)]

**+4**

Special Offense Characteristics: The offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material. [U.S.S.G §2G2.2(b)(6)]

**+2**

Special Offense Characteristics: The offense involved 600 or more images. [U.S.S.G §2G2.2(b)(7)(D)]

**+5**

Adjusted Offense Level (Subtotal):                    **37**

**Count Two:** Unlawful Retention of National Defense Information [18 U.S.C. § 793(e)]

Base Offense Level: Unlawful Retention of National Defense Information
18 U.S.C. § 793(e) – U.S.S.G §2M3.3(a)(2)

**24**

Adjustment for Role in the Offense: The Defendant abused a position of
public or private trust, or used a special skill, in a manner that significantly
facilitated the commission or the concealment of the offense. [U.S.S.G §
3B1.3]

**+2**

Adjusted Offense Level (Subtotal):                                              **26**

Multiple Count Adjustment: Units are assigned pursuant to § 3D1.4(a),
(b), and (c). One unit is assigned to the group with the highest offense
level. One additional unit is assigned for each group that is equally serious
or from 1 to 4 levels less serious. One-half unit is assigned to any group
that is 5 to 8 levels less serious than the highest offense level. Any groups
that are 9 or more levels less serious than the group with the highest
offense level are disregarded.

| Group/Count | Adjusted Offense Level | Units |
|-------------|------------------------|-------|
| Count 1     | 37                     | 1.0   |
| Count 2     | 26                     | 0.0   |

**1**

Greater of the Adjusted Offense Levels Above:                    **37**

Combined Adjusted Offense Level: Determined by taking the offense
level applicable to the Group with the highest offense level and increasing
the offense level by the amount indicated in the table at U.S.S.G. § 2D1.4.

**37**

Acceptance of Responsibility Adjustment [U.S.S.G § 3E1.1(a)]
Demonstrated acceptance of responsibility for offense                **-2**

Acceptance of Responsibility Adjustment [U.S.S.G § 3E1.1(b)]
Assisted authorities in the investigation/prosecution                **-1**

**Total Offense Level**:                                                        **34**

## II.   LEGAL BASIS FOR A DOWNWARD DEPARTURE FROM THE SENTENCING GUIDELINE RANGE

*Background.* Federal Sentencing Guidelines were established in an effort to "provide certainty and fairness in sentencing, to avoi[d] unwarranted sentencing disparities, to maintain sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices, and to reflect, to the extent practicable, [sentencing-relevant] advancement in [the] knowledge of human behavior." *Rita v. U.S.*, 551 U.S. 338, 348 (2007). In *U.S. v. Booker*, 125 S. Ct. 738, 756-757 (2005), the Supreme Court recognized that mandatory sentencing guidelines violate the Sixth Amendment to the United States Constitution. To remedy this constitutional violation, the Supreme Court severed and excised the portion of the federal sentencing statute - 18 U.S.C.A. § 3553(b)(1) – that made the sentencing guidelines mandatory. *Id.*

*Booker* made the sentencing guidelines "effectively advisory," and "requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a)." *Id.*

### 18 U.S.C.A. § 3553 Imposition of a Sentence

(a) Factors to be considered in imposing a sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

        (i) that, except as provided in section 3742(g), are in effect on the date the defendant was sentenced; or

    (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments under section 994(p) of title 29);

(5) any pertinent policy statement;

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28; and
(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Federal Sentencing Overview.* In short, a sentencing court must consider both the federal sentencing guidelines and the statutory factors under section 3553(a). *See United States v. Hunt*, 459 F. 3d 1180, 1185 (11th Cir. 2006) (holding "that a district court may determine, on a case-by-case basis, the weight to give the [sentencing] Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence."). If a court imposes a sentence properly calculated under the United States Sentencing Guidelines range, this sentence is clothed in a "presumption of reasonableness" under appellate review. *Rita v. U.S.*, 551 U.S. 338, 341(2007).

This "nonbinding appellate presumption that a Guidelines sentence is reasonable does not require the sentencing judge impose that sentence." *Id*. at 353. *See Kimbrough v. U.S.*, 552 U.S. 85, 91 (2007) (holding that under *Booker*, "the cocaine Guidelines, like all other Guidelines, are advisory only, and the [lower court] erred in holding the crack/powder disparity effectively mandatory. A district judge must include the

Guidelines range in the array of factors warranting consideration. The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing. 18 U.S.C.A. § 3553(a)."). *See also, United States v. Dorvee*, 616 F.3d 174, 184 (2nd Cir. 2010) (noting the "Commission did not use an empirical approach in formulating the guidelines for child pornography," similar to the crack cocaine guidelines at issue in *Kimbrough*).

### III. STATUTORY FACTORS: APPLICATION OF 18 U.S.C.A. § 3553 FACTORS

❖ **18 U.S.C.A. § 3553(1)** *Nature and circumstances of the offense and the history and characteristics of the defendant*

- *Nature and Circumstances of the offense:* On November 17, 2020, Mr. McLean sent four videos and one image to another individual using the private chat function of the Kik application.

In April 2021, law enforcement officers in Rhode Island sent the Naval Criminal Investigative Service (NCIS) a tip that ten (10) files containing child sexual abuse material (CSAM) were shared by a Kik user between the dates of August 24, 2020, and September 16, 2020. *See*, Exhibit C, at 7. The tip also contained the following Kik account information for the user who uploaded the CSAM: Email address: twisteddesire3210@gmail.com; Screen/username: twisteddesire3210_keg; and Internet Protocol (IP) Address: 216.237.98.68. *Id.*

In addition to providing the above information to NCIS, state law enforcement also issued search warrants for their investigation of the Kik account. *Id.* In response to the issued warrant, Kik provided information that showed the "twisteddesire3210" account had logged in from Jacksonville, using the IP address 162.225.165.18. *Id.*

Information from the service provider further indicated that the IP address was assigned to Gregory McLean, at his home address on Bentwater Drive, Jacksonville. *Id.*

While investigating the tip provided by state law enforcement, NCIS discovered another tip that was made to the National Center for Missing and Exploited Children (NCMEC) on December 1, 2020. *Id.*, at 8. This tip reported the upload of five (5) CSAM files by a Kik user, "twisteddesire3213_113" on November 17, 2020. *Id.* Information provided by Kik revealed these uploads were made from IP address 162.225.165.18, which is the same IP address assigned to Mr. McLean's home address. *Id.*

On November 4, 2021, federal agents executed a search warrant at Mr. McLean's Bentwater Drive residence. *Id.*, at 9. During the search, agents seized numerous electronic devices and storage media that were subsequently analyzed and attributed to Mr. McLean. *Id.* Specifically, analysis of Mr. McLean's phone revealed the presence of the username "twisteddesire" in its "user dictionary" and several "device cleaning" applications that had been installed. *Id.*, at 11. While no CSAM was located on Mr. McLean's cell phone, analysts did locate CSAM on three of the storage devices seized from Mr. McLean's home. *Id.*

In addition to the CSAM discovered on the storage devices, analysts also discovered a document ("Document A"), which, upon opening, bore the United States Government classification marking "SECRET//NOFORN/25X1"[1] at the top. *Id.*, at 12.

---

[1] As explained in the Pre-Sentence Investigation Report, "'NOFORN' means the information is NOT RELEASABLE TO FOREIGN NATIONALS. 'X1' is a marking signifying an exemption from automatic declassification in cases involving information that may reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence source, or security service of a foreign government or

Upon reviewing the document, analysts confirmed it contained information pertaining to national defense and to foreign governments and their military equipment, specifically as it relates to combat aircraft and impact. *Id.*

Based on the information gleamed from the seized devices, on September 19, 2022, Mr. McLean was arrested and taken into custody. *See*, Exhibit C, at 1. Though a grand jury initially returned a three-count Indictment against Mr. McLean, on November 20, 2023, the United States Attorney's Office filed a two-count Superseding Information, which charged Mr. McLean with one count of Distribution of a Visual Depiction, the Production of which Involved the Use of a Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. § 2252(a)(2); and one count of Unlawful Retention of National Defense Information, in violation of 18 U.S.C. § 793(e).

In accepting responsibility for his decisions and the actions that lead to the charges in this case, on December 6, 2023, Mr. McLean entered a plea of guilty to all charges pursuant to a pre-negotiated Plea Agreement. *See* Exhibit A. Under the provisions of this Plea Agreement, this Court may sentence Mr. McLean to prison for a minimum term of five (5) years and a maximum term of twenty (20) years. *See,* Exhibit C, at 1.

While the inherent nature of child pornography reflects the profound seriousness of such offenses, as reflected by the lofty guideline sentences to which they are paired, appellate courts have upheld the imposition of minimum or low prison sentences when

---

international organization, or a non-human intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development." Exhibit C, at 12.

warranted by the nature and circumstances of the offense. *See*, *U.S. v. Riley*, 655 F.Supp.2d 1298 (S.D. Fla. 2009) (finding a sixty-month sentence to be appropriate for the transportation of child pornography where the defendant was not involved in the production or widespread distribution of child pornography); *U.S. v. West*, 2023 WL 4399012 (11th Cir. 2023) (affirming imposition of ninety-month sentence for defendant charged with one count of distribution of child pornography, where the defendant used the internet to receive and send child pornography to others, and possessed "thousands of files of child pornography, including hundreds of images that involved violence, sadomasochism, or bestiality and hundreds of images that involved toddlers or infants").

Though Defendant concedes that there is sufficient evidence to prove the statutory elements of the charged offenses, Mr. McLean also contends that the facts and circumstances surrounding these offenses are unique such that the imposition of the five-year minimum mandatory is a reasonable sentence in his case. Like the defendants in *Riley* and *West*, the Defendant in this case used the internet to send and receive child pornography. Moreover, like the defendants in *Riley* and *West*, Mr. McLean never met any of the Victims in this case, nor did he personally produce any of the videos or images. Thus, following the holdings rendered in *Riley* and *West*, this Court should impose the five-year minimum mandatory sentence, which is reasonable given the unique facts and circumstances of Defendant's case.

- *History and Characteristics of the Defendant:* From an outside perspective, it may seem as though Mr. McLean lead a relatively normal life prior to his arrest in this case, as he graduated high school and college, he gained and maintained employment through the

Navy, he had no criminal history, and was married and lived with his wife. However, upon closer inspection, it is clear that Mr. McLean's life was far from normal, as the traumas he experienced throughout his childhood followed and impacted his transition into adulthood.

As previously mentioned, throughout Mr. McLean's childhood, he was traumatized by the sexual activity he experienced, by the pornography that he viewed at his father's house, and by the contentious divorce of his parents. Where Mr. McLean did not receive any psychological counseling or assistance growing up, his childhood traumas only compounded and worsened the trauma he experienced in the Navy. Unable to cope with the stress of work and the traumas of his past, Mr. McLean relied on alcohol and the dark web for solace.

While Mr. McLean wishes that he could have received help sooner, he is grateful for the psychological counseling that he received while in custody and intends to continue upon his release. Mr. McLean has also found great solace in his faith and religion, as he is now a preacher and leads weekly church services at the jail. In addition to the weekly church services, Mr. McLean also leads prayer groups throughout the week and encourages other inmates to find peace in prayer.

In cases involving similar facts and circumstances, appellate courts have upheld the imposition of minimum or relatively low prison sentences where the history and characteristics of the defendant provide evidence that defendant was abused as a child, had issues with mental health as an adult, and had minimal criminal history. *See U.S. v. Gray*, 453 F.3d 1323 (11th Cir. 2006) (affirming the district court's downward departure

and imposition of 72-month prison sentence for distribution of child pornography, where the defendant was sixty-four years old, had a minimal criminal history, and suffered from depressive disorder.). *See also, U.S. v. McBride*, 511 F.3d 1293 (11th Cir. 2007) (affirming the district court's downward departure and imposition of 84-month prison sentence for distribution of child pornography was reasonable, where the district court considered the defendant was sexually abused by his grandfather, defendant was diagnosed with depression and anxiety, and the defendant expressed a desire to be placed in a residential treatment program); and *U.S. v. West*, 2023 WL 4399012 (11th Cir. 2023) (affirming 90 month prison sentence for distribution of child pornography, where the defendant was sexually abused and exposed to pornography at a young age).

Like the defendant in *McBride*, the Defendant in this case was subjected to sexual abuse at an early age. Moreover, like the defendants in *McBride* and *Gray*, the Defendant in this case has been diagnosed with PTSD and depression, for which he is currently prescribed Cymbalta. Though there are few program and treatment options currently available at the Nassau County Detention Center, the Defendant hopes more resources will become available post-sentencing and is eager to participate. In addition to Defendant's childhood abuse and subsequent struggles with mental health, like the court in Gray, this Court should consider the fact that the Defendant has no criminal history whatsoever. Thus, following the court's holdings in *Gray* and *McBride*, this Court should impose the five-year minimum mandatory sentence in Defendant's case, as the Defendant was abused as a child, was exposed to pornography at a young age, struggles with mental

health as an adult, has no criminal history, and is amenable to change with the proper treatment.

❖ **18 U.S.C.A. § 3553(2) THE NEED FOR THE SENTENCE IMPOSED**

*(A)to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

- *18 U.S.C.A.§ 3553(2)(A)*: *to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense;*

Pursuant to the pre-negotiated Plea Agreement, Mr. McLean will be sentenced on one count of Distribution of a Visual Depiction, the Production of which Involved the Use of a Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. § 2252(a)(2); and one count of Unlawful Retention of National Defense Information, in violation of 18 U.S.C. § 793(e). *See* Exhibit A at 1.

While it is indisputable that distribution of child pornography is a serious offense that results in perpetual harm to victims, this Court must evaluate the specific facts of this case and render a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C.A. § 3553(2)(A). As described in the legislative history of Section 3553(a):

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the

circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

S.Rep. No. 98–225, at 75–76, 1984 U.S.C.C.A.N. at 3258–59.

This is concept of individually analyzing the circumstances surrounding the charged conduct of each case is especially true for those involving child pornography, as there are a number of enhancements that apply in nearly every case. In a Letter from Anne Gannon,[2] the United States Department of Justice addressed the application of these enhancements as follows:

We agree with the Report's conclusion that the existing specific offense characteristics ("SOCs") in USSG 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness. The current guidelines can at times under-represent and at times over-represent the seriousness of an offender's conduct and the danger an offender poses." DOJ recommended the guidelines "should establish sentencing ranges based on how an offender obtains child pornography; the volume and type of child pornography an offender collects; how long an offender has been collecting child pornography; the attention and care an offender gives to his collection; how an offender uses his collection once obtained; how an offender protects himself and his collection from detection; and whether an offender creates, facilitates, or participates in a community centered on child exploitation." DOJ Letter at 2.

Upon reviewing child pornography cases where the defendant does not harm or otherwise interact with the victim, but merely downloads or distributes child pornography

---

[2] Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney General, U.S. Dep't of Justice, to Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n at 1 (March 5, 2013), available at http://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf (last visited March 27, 2020) ("DOJ Letter").

that was already in existence, appellate courts have found the imposition of mandatory minimum sentences to be reasonable, as they reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. *See, U.S. v. Gray*, 453 F.3d 1323 (affirming defendant's sentence to 72 months in prison for distribution of child pornography, where the defendant had created an online screenname to interact and exchange child pornography with other individuals); *see also, U.S. v. Riley*, 655 F.Supp.2d 1298 (S.D. Fla. 2009) (affirming defendant's sentence to 60 months in prison for distribution of child pornography, where the defendant used online chat room to exchange child pornography).

Like the defendants in *Gray* and *Riley*, Mr. McLean created a screen name that he used in online chat forums to exchange child pornography with other individuals. However, in considering how the images were obtained, this Court should give special consideration to the fact that none of the images or videos possessed by Mr. McLean were created or produced by the Defendant himself. While minors are certainly a class of people in need of protection, this Court should consider the fact that Congress initially enacted mandatory minimum sentences for the production of child pornography in 1996, which was long before the existence of cell phones with cameras and social media applications. While the evolution of the statute reflects the legislative intent to implement harsh minimum mandatory sentences for those who violate the federal production of child pornography statute, the legislature fails to address the significant differences between those who use the internet to exchange images were previously produced and disseminated, and those who physically force and engage in the production of child

pornography. Thus, given the specific facts of this case, this Court should follow the courts' holdings in *Gray* and *Riley*, and render the applicable five-year minimum mandatory sentence in Mr. McLean's case, as it adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.

- *18 U.S.C.A. § 3553(2)(B)*: *to afford adequate deterrence to criminal conduct;*

The collateral consequences Mr. McLean will face as a convicted felon serve as a substantial deterrent for future criminal conduct. In *United States v. Nesbeth*, 188 F.Supp.3d 179, 180 (E.D.N.Y. 2016), Senior District Court Judge Block, urged the legal community to consider the "collateral consequences" of a felony conviction, many of which . . . "serve no useful function other than to punish defendants after they have completed their court-imposed sentences." Citing related research and over two decades of judicial experience, Judge Block notes these "collateral consequences" "amount to a form of 'civil death' and send the unequivocal message that 'they' are no longer part of 'us.'" *Id.* These "collateral consequences" include, but are not limited to, denial of certain government benefits, denial of public housing, loss of eligibility for certain forms of financial aid, grants, loans, and, of course, the well-known loss of one's right to vote, or to sit on a jury. *Id.* at 185. Further, even after a sentence is completed, a convicted felon may be precluded from obtaining certain professional licenses and will likely find it incredibly difficult to gain employment because many employers refuse to hire ex-convicts and convicted felons. *Id.*

The *Nesbeth* defendant had been convicted of a drug trafficking charge and was facing 33 to 41 months in prison. *Id.* Instead of imposing a prison sentence, however,

Judge Block ordered Ms. Nesbeth to complete one year of probation, with six months of home confinement, and 100 hours of community service. Judge Block explained this sentence by noting the above-mentioned consequences of being a convicted felon and determined that defendant Nesbeth would be "sufficiently punished" and "is likely to suffer – principally [because of] her likely inability to pursue a teaching career and her goal of becoming a principal." *Id.* at 194. In short, "jail [was] not necessary to render a punishment that is sufficient but not greater than necessary to meet the ends of sentencing." *Id.* at 194. Mr. Fierros urges this Honorable Court to adopt the reasoning in *Nesbeth* and consider the collateral consequences the Defendant will face as a convicted felon and registered sex offender.

Moreover, because has no prior criminal history, a five-year period of incarceration, followed by any period of house arrest, supervised release, community service, continued treatment, permanent felony conviction, and sexual offender registration is sufficient to deter Mr. McLean from reoffending.

- *18 U.S.C.A. § 3553(2)(C): to protect the public from further crimes of the defendant;*
- *18 U.S.C.A. § 3553(2)(D): to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;*

In this case, 18 U.S.C.A. §§ 3553(2)(C) and 3553(2)(D) can be considered in conjunction. Protecting the public from "future crimes" of Mr. McLean, can be accomplished by continuing his treatment through psychological counseling and supervised release. To the extent this Court has specific concerns regarding Defendant's release, the Court has the discretion to impose any special conditions that it deems

necessary, in addition to that which requires Mr. McLean to enlist as a registered sex offender.

❖ **18 U.S.C.A. §3553(3): THE KINDS OF SENTENCES AVAILABLE**

This Honorable Court has discretion to impose a term of imprisonment, a term of supervised release, probation under the Statutory Provisions, as well as a fine. Each kind of sentence available is addressed below, under 18 U.S.C.A. §3553(4).

❖ **18 U.S.C.A. §3553(4): THE KINDS OF SENTENCE AND SENTENCING RANGE ESTABLISHED FOR** – *(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—(i) that, except as provided in section 3742(g), are in effect on the date the defendant was sentenced;*

*Imprisonment.* On Count One, Mr. McLean is facing a maximum term of twenty (20) years imprisonment pursuant to 18 U.S.C. § 2252(a)(2); and on Count Two, he faces a maximum term of five (5) years imprisonment pursuant to 18 U.S.C. § 793(e). Thus, Mr. McLean is facing a maximum term of thirty (30) years imprisonment. Based on the total offense level of thirty-four (34) and a criminal history category of I, the guideline imprisonment sentence is 151 months to 188 months.

*Supervised Release.* As to Counts One, the Court shall impose a term of supervised release of five years to life, pursuant to 18 U.S.C. § 3583(k). As to Count Two, the Court may impose a term of supervision of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2). However, multiple terms of supervised release shall run concurrently, in accordance with 18 U.S.C. § 3624(e).

*Probation.* As to Counts One and Two, Mr. McLean is not eligible for probation because Count One subjects him to a mandatory term of imprisonment and because he is

being sentenced on Count Two at the same time as Count One. *See,* 18 U.S.C.A. § 3561(a)(3).

*Fines.* As to Counts One and Two, the maximum fine is two-hundred and fifty thousand dollars ($250,000.00) per count. *See,* 18 U.S.C.A. § 3571(b). A special assessment of one-hundred dollars ($100.00) per count is mandatory pursuant to 18 U.S.C.A. § 3013. Additionally, Mr. McLean is subject to the provisions of the Justice for Victims of Trafficking Act of 2015. Thus, as to Count 1, in addition to the assessment imposed under section 3013, the Court shall assess an amount of $5,000, per count, on any non-indigent person or entity convicted of an offense under 18 U.S.C. Chapters 77, 109A, 110, 117; or Section 274 of the Immigration and Nationality Act (8 U.S.C. § 1324). 18 U.S.C. § 3014.

Furthermore, as to Count One, Mr. McLean is also subject to the provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018. Thus, in addition to any other criminal penalty, restitution, or special assessment authorized by law, the Court shall assess (1) not more than seventeen thousand dollars ($17,000.00) on any person convicted of an offense under 18 U.S.C.A. § 2252(a)(4) or § 2252(a)(5); (2) not more than thirty-five thousand dollars ($35,000.00) on any person convicted of any other offense for trafficking in child pornography; and (3) not more than fifty-thousand dollars ($50,000.00) on any person convicted of a child pornography production offense. When ordering this assessment, the Court shall consider the factors set forth in 18 U.S.C. §§ 3553(a), 3572, and 2259A.

In determining whether to impose a fine and if so, the amount of the fine, the sentencing court considers several factors including costs acquired by the government associated with Defendant's term of imprisonment, term of probation, or term of supervised release, under U.S.S.G §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). The Administrative Office of the United States Courts, dated October 25, 2023, offered estimates for post-conviction imprisonment ($136.00 daily/$4,147.00 monthly/$49,770.00 annually); residential reentry centers ($107.00 daily/$3,266.00 monthly/$39,197.00 annually); and post-conviction supervision ($12.00 daily/$366.00 monthly/$4,387.00 annually).

*Restitution.* Pursuant to 18 U.S.C. § 2259(c)(3), this is a child pornography trafficking offense and thus restitution is mandatory, as set forth in 18 U.S.C. § 2259(b)(2). Thus, the Court shall determine the full amount of the Victims' losses and shall order restitution in an amount that reflects the defendant's role in the casual process that underlies the Victims' losses, but which is no less than three-thousand dollars ($3,000.00).

❖ **18 U.S.C.A. §3553(6):** THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES *among defendants with similar records who have been found guilty of similar conduct;*

In order to avoid unwarranted sentencing disparities, this Court is required to "consider other similarly situated defendants – criminal defendants in other cases who were convicted of similar crimes." *United States v. McQueen*, 727 F.3d 1144, 1160 (11th Cir. 2013) (*citing United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008). This Court has conducted this analysis for countless cases and in doing so, has recognized and

reflected upon the difficulty in applying the sentencing guidelines in cases like the Defendant's. *See*, Transcript of Sentencing Hearing, *U.S. v. John Stevenson*, 3:13-cr-106-J-32JRK, (M.D. Fla. 2013), attached hereto as "**Exhibit E**".

In doing so, this Court has specifically recognized a distinction "between production and victimization that's personal to the so-called average collector or—or a person who's file sharing but didn't have any role to play in actually producing child pornography ab initio." *See*, Exhibit F, at 17:17-20. Moreover, in analyzing the case law that was available to the Court at that time, the Court cited several cases where a downward departure was upheld on appeal, and stressed the significant effect that a five-year sentence would have:

> [A] sentence of five years for a first offender is a substantial sentence. Five years is not a slap on the wrist. It is 260 weeks, 1825 days. Anyone who thinks five years of incarceration is a slap on the wrist has not visited federal prison lately.
> …
> Even under the most humane and enlightened conditions, which are imperiled once fellow inmates learn about why a downloader is serving time, five years is a significant loss of liberty.

Exhibit F, at 21:25-22:10.

While Mr. McLean concedes that the facts of his case meet the statutory requirements of the charged offenses, he urges this Court to evaluate the seriousness of his offense as one "for nonproduction child pornography offenses," as the facts of Mr. McLean case are nearly identical to those discussed in *United States v. Gray*, 453 F.3d 1323 (11th Cir. 2006). In *Gray*, the defendant created a screen name that he would use in chatrooms to exchange child pornography images. *Id.*, at 1323. Upon linking the screen

name to the defendant, a search warrant was executed upon the defendant's home and law enforcement discovered hundreds of child pornography images stored on his computer. *Id.* The defendant was subsequently charged with one count of distribution of child pornography and one count of possession of child pornography, for which his guideline range was 151 to 188 months imprisonment. *Id.*, at 1324. At sentencing, the defendant sought a downward departure on the basis that he was a 64-year-old man, he suffered from a depressive disorder, he had never molested a child, and he had minimal criminal history. *Id.* at 1324. Upon considering all the relevant factors, the District Court sentenced the defendant to seventy-two (72) months (or six years) in federal prison, which was affirmed by the Eleventh Circuit on appeal. *Id.*, at 1325.

Like the defendant in *Gray*, the Defendant in this case created a screen name that he used in chat rooms to exchange child pornography images. Upon linking the screen name to the Defendant, law enforcement executed a search warrant on his home and found child pornography images on several storage devices. While the distribution of such images does not excuse or negate Mr. McLean's conduct, it's important to note that he never met, nor did he have any physical contact with the children depicted in the seized images. Furthermore, like the defendant in *Gray*, Mr. McLean suffers from a depressive disorder, has never molested a child, and has no criminal history. Thus, following the holdings of *Gray*, this Court should impose a five-year prison sentence, which is the lowest permissible sentence and the would be the closest available sentence to that which was rendered in *Gray*.

In short, the totality of the circumstances in this case offers sufficient justification for this Court to depart from the advisory guidelines and sentence Mr. McLean to five years imprisonment, with any special conditions the Court finds necessary.

## CONCLUSION

Mr. McLean respectfully requests this Honorable Court to order a sentence that departs downward from the advisory guideline range sentence recommended by the United States Probation Office, downward from the Government's recommendation, and sentence the Defendant to five years in federal prison, followed by a period of supervised release.

## CERTIFICATE OF SERVICE

I hereby certify that on May 14th, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:  David B. Mesrobian, Esquire, Assistant United States Attorney, United States Attorney's Office, 300 N. Hogan St., Suite 700, Jacksonville, FL 32202.

Respectfully submitted,
**TASSONE, DREICER, & HILL**

/s/ Jesse N. Dreicer
JESSE N. DREICER, ESQUIRE
Florida Bar No.:  47505
JAMES P. HILL, ESQUIRE
Florida Bar No.:  0073828
1833 Atlantic Boulevard
Jacksonville, Florida 32207
P:  904.396.3344
F:  904.396.3349
Email:  jesse@tassonelaw.com
Attorneys for Defendant

# EXHIBIT A

FILED IN OPEN COURT

12-6-2023

CLERK. U S DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE. FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 3:22-cr-115(S1)-TJC-JBT

GREGORY EDWARD MCLEAN
    a/k/a "twisteddesire3210,"
    a/k/a "twisteddesire3213"

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Roger B. Handberg, United States Attorney for the Middle District of Florida,

and the United States Department of Justice, National Security Division

(hereinafter collectively the "Offices" or the "United States") and the defendant,

GREGORY EDWARD MCLEAN, and the attorney for the defendant, Jesse

Dreicer, Esq., mutually agree as follows:

### A.   Particularized Terms

1.   Count Pleading To

The defendant shall enter a plea of guilty to Counts One and Two

of the Superseding Information. Count One charges the defendant with

distribution of a visual depiction, the production of which involved the use of a

minor engaging in sexually explicit conduct, in violation of 18 U.S.C.

Defendant's Initials                              AF Approval MT/DBM

§ 2252(a)(2) and (b)(1). Count Two charges the defendant with unlawful retention of national defense information, in violation of 18 U.S.C. § 793(e).

    2.    <u>Minimum and Maximum Penalties</u>

Count One is punishable by a mandatory minimum term of imprisonment of not less than five years and not more than 20 years, a fine of not more than $250,000, or both imprisonment and a fine, a term of supervised release of at least five years up to life, and a special assessment of $100.

Pursuant to 18 U.S.C. § 3583(k), if the defendant is required to register under the Sex Offender Registration and Notification Act and commits any criminal felony offense under Title 18, United States Code, Chapter 109A, 110 or 117, or Sections 1201 or 1591, the Court shall revoke the term of supervised release and require the defendant to serve a term of imprisonment of not less than five years and up to life. Any other violation of the terms and conditions of supervised release is punishable by a term of imprisonment of up to two years.

With respect to Count One and pursuant to 18 U.S.C. §§ 2259, 3663A and/or 3664, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below. Pursuant to 18 U.S.C. § 2259, if the Court

Defendant's Initials         2

orders restitution, the mandatory minimum amount must not be less than $3,000 per victim.

Additionally, pursuant to 18 U.S.C. § 2259A, the Court shall impose a special assessment of up to $35,000 on any defendant convicted of a trafficking in child pornography offense, such as Count One.

In addition, pursuant to 18 U.S.C. § 3014, the Court shall impose a $5,000 special assessment on any non-indigent defendant convicted of an offense in violation of certain enumerated statutes involving: (1) peonage, slavery, and trafficking in persons; (2) sexual abuse; (3) sexual exploitation and other abuse of children; (4) transportation for illegal sexual activity; or (5) human smuggling in violation of the Immigration and Nationality Act (exempting any individual involved in the smuggling of an alien who is the alien's spouse, parent, son or daughter).

Count Two carries a maximum sentence of ten years' imprisonment, a fine not to exceed $250,000, a term of supervised release of not more than three years, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

Defendant's Initials           3

3.    Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count One are:

First:      That the defendant knowingly distributed a visual depiction;

Second:     the defendant did so using any means and facility of interstate and foreign commerce;

Third:      producing the visual depiction involved the use of a minor engaging in sexually explicit conduct;

Fourth:     the depiction is of a minor engaged in sexually explicit conduct; and

Fifth:      the defendant knew that at least one performer in the visual depiction was a minor and knew that the depiction showed the minor engaged in sexually explicit conduct.

The elements of Count Two are:

First:      The defendant had possession of, access to, or control over document(s) relating to the national defense of the United States;

Second:     The defendant was not authorized to possess the document(s);

Third:      The defendant willfully retained and failed to deliver the document(s) to an officer or employee of the United States entitled to receive it; and

~~Fourth:     The defendant acted willfully.~~ ℓ



Defendant's Initials ⟨ ⟩          4

4.    Indictment Waiver

The defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.    Indictment Dismissed

At the time of sentencing, the original Indictment against the defendant will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

6.    No Further Charges

If the Court accepts this plea agreement, the Offices agree not to charge defendant with committing any other federal criminal offenses known to the United States at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

7.    Sentencing Recommendation

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree that, although not binding on the United States Probation Office or the Court, they will jointly recommend that the Court impose concurrent sentences for Counts One and Two.  The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

Defendant's Initials           5

8.      Sex Offender Registration and Notification

The defendant has been advised and understands, that under the Sex Offender Registration and Notification Act, a federal law, the defendant must register and keep the registration current in each of the following jurisdictions: the location of the defendant's residence, the location of the defendant's employment; and, if the defendant is a student, the location of the defendant's school.   Registration will require that the defendant provide information that includes name, residence address, and the names and addresses of any places at which the defendant is or will be an employee or a student.   The defendant understands that he must update his registrations not later than three business days after any change of name, residence, employment, or student status.   The defendant understands that failure to comply with these obligations subjects the defendant to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

9.      Restitution to Any Minor Victims of Offenses
        Committed by Defendant, Whether Charged or Uncharged

Pursuant to 18 U.S.C. §§ 3663(a)(3), 3663A(a) & (b), 18 U.S.C. § 3664, 18 U.S.C. § 2248, and 18 U.S.C. § 2259, the defendant agrees to make full restitution to all minor victims of his offenses as to the counts charged. Further, the defendant agrees to pay restitution to any of his minor victims, for

Defendant's Initials           6

the entire scope of his criminal conduct, including but not limited to all matters included as relevant conduct. The defendant acknowledges and agrees that this criminal conduct (or relevant conduct) includes any minor victim of any child pornography offenses, charged or uncharged, under Chapter 110, United States Code, and any minor victim of any violation of federal and/or state law committed by the defendant, including any contact sexual offense. Further, pursuant to 18 U.S.C. § 3664(d)(5), the defendant agrees not to oppose bifurcation of the sentencing hearing if the victims' losses are not ascertainable prior to sentencing. Pursuant to 18 U.S.C. § 2259, if the Court orders restitution, the mandatory minimum amount must not be less than $3,000 per victim.

    10.    <u>Acceptance of Responsibility - Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant

Defendant's Initials        7

complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

11.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 2253 and/or 18 U.S.C. § 793(h)(1), whether in the possession or control of the United States, the defendant or defendant's nominees.

The assets to be forfeited specifically include, but are not limited to, a Motorola Droid Turbo cellular telephone, a Samsung Galaxy S20 Ultra cellular telephone, a green Western Digital Hard Drive s/n WXE507092327, and a Flash Drive USB2.0 (marked "Vincennes University"), which assets were

Defendant's Initials _____            8

used in the commission of the offense conduct and contained visual depictions of minors engaged in sexually explicit conduct.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

Defendant's Initials                     9

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.

Defendant's Initials ____          10

The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.

The defendant agrees that the United States is not limited to forfeiture of the property specifically identified for forfeiture in this Plea Agreement. If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above. The Defendant expressly consents to the forfeiture of any substitute assets sought by the Government. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant

Defendant's Initials             11

may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including satisfaction of any preliminary order of forfeiture for proceeds.

12.   Abandonment of Property - Computer Equipment

The United States and defendant hereby agree that any computer equipment as defined in 18 U.S.C. § 2256, seized from the defendant and currently in the custody and/or control of the Federal Bureau of Investigation or other appropriate agency, were properly seized and are subject to forfeiture to the government according to 18 U.S.C. §§ 2253 or 2254, and/or that the computer equipment and peripherals constitute evidence, contraband, or fruits of the crime for which he has pled guilty. As such, defendant hereby relinquishes all claim, title and interest he has in the computer equipment and

Defendant's Initials (M)          12

peripherals to the United States with the understanding and consent that the
Court, upon approval of this agreement, hereby directs the Federal Bureau of
Investigation, or other appropriate agency, to cause the computer equipment
described above to be destroyed forthwith without further obligation or duty
whatsoever owing to defendant or any other person.

As part of the plea agreement in this case, defendant hereby
states under penalty of perjury that he is the sole and rightful owner of the
property, and that defendant hereby voluntarily abandons all right and claim
to and consents to the destruction of the following:

  a. Black Motorola Cell Phone;

  b. Black iPhone;

  c. Black Sony VAIO Laptop SN #27527431, Model #PCG-
    81115L;

  d. Grey Apple MacBook Air, SN #FVFOQM5GMNHP;

  e. Black Seagate Free Agent Go, 500 GB, SN #2GE2CW67;

  f. Black Sony 1GB USB storage device SN #07151CDAV;

  g. Dane-Elec Silver and Black USB storage device on a Silver
    Chain;

  h. ATP tough Drive, 2GB, Camo Pattern with silver clip SN
    #AF2GUFT3CAD;

  i. Clear case containing SanDisk Micro SD Adapter and a
    SanDisk Ultra Plus 32 GB Micro SD Card SN
    #7141DRAY304V;

  j. PNY 16GB, Black and White USB storage device;

Defendant's Initials   13

k.    Kingston Data Traveler 1GB USB storage device;

l.    Grey USB storage device with a green clip attached;

m.    Silver and Blue Nokia Cingular Cell Phone;

n.    Teal USB storage device;

o.    T-Mobile LG Cellphone in a Pink, White and Black plaid case;

p.    Black Verizon cellphone in a black Otterbox case;

q.    PNY 32GB Micro SD Card; and

r.    Assorted optical discs.

As part of the plea agreement in this case, the defendant hereby states under penalty of perjury that he is the sole and rightful owner of the property, and that defendant hereby voluntarily abandons all right and claim to and consents to the destruction of all items the list above, seized from the defendant's residence on or about November 4, 2021.

**B.**     **Standard Terms and Conditions**

1.    <u>Restitution, Special Assessment and Fine</u>

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant

Defendant's Initials       14

enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2.      Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.      Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from

Defendant's Initials _____        15

the United States, denied citizenship, and denied admission to the United States in the future.

    4.    Sentencing Information

        The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

    5.    Financial Disclosures

        Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a

Defendant's Initials _(M)_       16

spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make

Defendant's Initials ___(N)___          17

recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

      7.    Defendant's Waiver of Right to Appeal the Sentence

      The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the

Defendant's Initials ___      18

sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.     Scope of Agreement

It is further understood that this agreement is limited to the Offices, and cannot bind other federal, state, or local prosecuting authorities, although the Offices will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.     Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or

Defendant's Initials _____      19

coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be

Defendant's Initials _____        20

deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

     11.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

     12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials      21

13.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___7ᵗʰ___ day of ~~October,~~ 2023.
December, 2023

ROGER B. HANDBERG
United States Attorney

_____
GREGORY EDWARD MCLEAN
Defendant

_____
David B. Mesrobian
Kirwinn Mike
Assistant United States Attorneys

_____
Jesse Dreicer, Esq.
Attorney for Defendant

_____
Michael J. Coolican
Assistant United States Attorney
Deputy Chief, Jacksonville Division

_____
For Cherie L. Krigsman
Assistant United States Attorney
Chief, National Security Section

_____
For Heather Schmidt
Senior Trial Attorney
National Security Division
U.S. Department of Justice

Defendant's Initials _____        22

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:22-cr-115(S1)-TJC-JBT

GREGORY EDWARD MCLEAN
    a/k/a "twisteddesire3210,"
    a/k/a "twisteddesire3213"

### PERSONALIZATION OF ELEMENTS

Count One

1.      On or about November 17, 2020, in the Middle District of Florida, and
elsewhere, did you knowingly distribute a visual depiction?

2.      Do you admit that you distributed the visual depiction using any means
and facility of interstate and foreign commerce, that is by cellular telephone and the
internet?

3.      Do you admit that the production of such visual depiction involved a
minor engaging in sexually explicit conduct?

4.      Do you admit that this visual depiction was of a minor engaging in
sexually explicit conduct?

Defendant's Initials           23

5. Do you admit that you knew that at least one performer in the visual depiction was a minor and knew that the depiction showed the minor engaged in sexually explicit conduct?

Count Two

1. From an unknown date, but continuing through on or about November 4, 2021, in the Middle District of Florida, did you, in your personal residence, have possession of, access to, or control over two documents classified at the Secret level relating to the national defense of the United States?

2. Do you admit that you were not authorized to possess, have access to, or have control over the documents within your personal residence?

3. Did you retain *willfully* and fail to deliver the documents to an officer and employee of the United States who is entitled to receive them? *DBM*

~~4. Did you act willfully?~~



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:22-cr-115(S1)-TJC-JBT

GREGORY EDWARD MCLEAN
    a/k/a "twisteddesire3210,"
    a/k/a "twisteddesire3213"

### FACTUAL BASIS

## I.    **Distribution of Child Pornography**

### A.    Initial Investigation

In April 2021, the Naval Criminal Investigative Service (NCIS) received a tip from state law enforcement in Rhode Island that 10 files containing child sexual abuse material (CSAM) had been shared by a user of Kik/Medialab (Kik), a messaging application, with other users between August 24, 2020 through September 16, 2020. The files constituted nine videos and one still image of CSAM; one of the files was a video depicting a partially clothed adult male inserting his penis into the anus of an infant.

State law enforcement shared the Kik account information it obtained for the user who uploaded the CSAM, which was:

Defendant's Initials           25

> Email address:      twisteddesire3210@gmail.com
> Screen/user name: twisteddesire3210_keg
> Internet Protocol (IP) Address:   216.237.98.68

The investigation showed that this IP address resolved to a particular hotel in Middletown, Rhode Island.   State law enforcement had previously executed search warrants in connection with their investigation, including on the Kik account.

The information provided by Kik showed that the user of the "twisteddesire3210" account had also logged into the account from Jacksonville, Florida, in the Middle District of Florida, using the IP address 162.225.165.18. According to information from the service provider, the IP address was assigned to the defendant, GREGORY EDWARD MCLEAN, at his home address (a particular residence on Bentwater Drive, Jacksonville, FL 32246).   The email address gnole3213@att.net was associated with the IP address from November 2, 2018, through January 15, 2021.  With respect to the "twisteddesire3210" account name, the digits "3210" were  associated with certain personal identifying information of MCLEAN.

Rhode Island authorities advised NCIS of the foregoing because MCLEAN was at that time an active duty officer in the United States Navy (USN), with the rank of Lieutenant Commander and serving as the Executive Officer (XO) of the U.S.S. Minneapolis-Saint Paul (LCS-21) stationed aboard Naval Station (NS) Mayport, Florida.  Through USN records, NCIS confirmed that MCLEAN was

Defendant's Initials _(𝓌𝓮)_          26

staying in Rhode Island on official travel during the time period of the Kik uploads. Specifically, MCLEAN was on temporary duty at NS Newport, Rhode Island, between July 11, 2020 and September 25, 2020 as a student at the Surface Warfare Officers School. Middletown is just outside of NS Newport. Military records confirmed that MCLEAN's home address was the identified address on Bentwater Drive in Jacksonville where he lived with his wife, C.M., and that his personal email address was gnole3213@gmail.com.

Further, legal process from the hotel in Middletown confirmed that MCLEAN was staying at the hotel from July 11, 2020 through September 26, 2020. He checked in using a loyalty rewards program number in his name, and with his home address and phone number. The hotel also produced a State of Rhode Island Certificate of Compliance signed by MCLEAN, acknowledging COVID restrictions in place at the hotel at the time. The data obtained from Kik also showed logins to the twisteddesire3210_keg account from Dubai on or about October 20, 2019, Bahrain on or about October 26, 2019, and a hotel in Marinette, Wisconsin from approximately June 13, 2020, through June 20, 2020. USN records showed that MCLEAN was on official travel in those three locations on or about those dates.

Subsequently, NCIS discovered another tip made to the National Center for Missing and Exploited Children (NCMEC) dated December 1, 2020. The tip information reported the upload of five CSAM files by a Kik user on or about

Defendant's Initials            27

November 17, 2020. The account which uploaded the files had the user name "twisteddesire3213." Information obtained from Kik revealed the following subscriber information:

> Email address:      joesmith32103210@gmail.com
> Screen/user name: twisteddesire3213_Il3
> IP Address: 162.225.165.18
> Phone type: Android

The IP address from which the user distributed the CSAM was the same Jacksonville-based IP address previously identified as assigned to MCLEAN at his home residence. The CyberTip reported five files (four videos and one image) sent within a few minutes of each other on November 17, 2020, using the private chat message function. Two of the video files distributed can be described as follows:

- File name: 25984456-72bf-4ec2-8ad2-299fe701270d.mp4, uploaded to Kik on November 17, 2020 at approximately 16:02:15 UTC. This is a color video, with sound, approximately 64 seconds in length. In the beginning of the video, a completely nude pre-pubescent female child wearing a mask, is lying on her back on what appears to be a bed. An adult male is holding one of the child's legs while inserting what appears to be a sex toy into the child's vagina. The camera then zooms into a close-up, and the sex toy is removed and the adult states, "You spread that pussy wide open you fucking cunt," as the child spreads open her vulva with her hands. The adult states, "You like being raped?" and the child responds, "Yes." The adult states, "Do you want to be raped again?" and the child responds, "Yes." The adult orders the child to insert a finger into her vagina and the child complies by inserting one finger, and begins to masturbate. The camera zooms out and video ends. The female in the video is a pre-pubescent child based on the overall size of her body, child-

Defendant's Initials           28

like features, lack of breast development, and lack of pubic hair. This file was identified by NCMEC to contain a child victim previously identified by law enforcement.

- File name: e790c854-586a-44c0-b3df-f8ea788457f0.mp4, uploaded to Kik on November 17, 2020 at approximately 16:06:25 UTC. This is a color video, with sound, approximately 28 seconds in length. In the beginning of the video, a completely nude pre-pubescent female child is on her hands and knees on what appears to be a bed. An adult male is visible behind her masturbating with his hand on her buttocks. The child then states, "Fuck me in the ass." The camera switches the adult's point of view and the adult attempts to insert his penis into the child's anus and the child cries out. The view is switched a third time, with the male now holding the child with both hands, and penetrating her from the rear as she is bent forward. As the male thrusts his hips, she cries loudly and video ends. The female in the video is a pre-pubescent child based on the overall size of her body, child-like features, lack of breast development, and lack of pubic hair.

B.    JSO Knock and Talk

Unrelated to the federal investigation, on March 10, 2021, a detective with the Jacksonville Sheriff's Office (JSO) went to MCLEAN's residence on Bentwater Drive for the purpose of conducting a knock and talk regarding one of the same CSAM-related CyberTips that resolved back to the address. The detective made contact with L.H. at the home, who was MCLEAN's father-in-law. L.H. denied any knowledge as to Kik or child pornography.

Defendant's Initials _____          29

C.    Execution of Federal Search Warrant and Interviews

On November 4, 2021, agents executed a federal search warrant at MCLEAN'S residence on Bentwater Drive (Case No. 3:21-mj-1489-MCR). MCLEAN and other family members, including C.M., were present.

Agents conducted a recorded interview of C.M.  She advised that she knew her husband, MCLEAN, had a Kik account but believed he had previously shut it down.  She did not know his username and said she had never heard of "twisteddesire."  She said he used a personal Android cell phone.

Agents also conducted a recorded interview of MCLEAN.  MCLEAN admitted using Kik but stated that his username was "backwoodsredneck," and claimed not to have used Kik for more than one year. He denied using the sequenced numbers 3210 and 3213 for any accounts or usernames (despite 3210 being associated with his personal identifying information, and USN records reflecting that his personal email was gnole3213@gmail.com.) MCLEAN denied engaging in any activity related to child pornography. He admitted to staying at the particular hotel in Rhode Island, and to using his laptop and Android telephone while there. MCLEAN stated that he may have used Kik while staying in Rhode Island, but he could not remember. MCLEAN also admitted lodging at the hotel in Marinette, Wisconsin. Agents observed MCLEAN shaking during the interview, and he commented on the recording that he could not stop shaking. MCLEAN further

Defendant's Initials _____        30

stated, "I understand that no matter what, with this process, it's something that I'm going to have to go through and that my career is probably over and everything else."

Agents conducting the search of the residence found and seized numerous electronic devices and storage media, of which the other individuals living at the residence disclaimed ownership. Florida Department of Law Enforcement K9 Maple was used to search the residence, during which the K9 alerted to a plastic plant in the sunroom. Upon closer inspection, agents discovered a Micro SD card concealed within the fake soil of the plastic plant.

D.    Forensic Analysis of Seized Devices

The seized devices and media were submitted for forensic review by NCIS. The results of the analysis included:

- A Motorola Droid Turbo XT-1254 Android cellular phone identified as MCLEAN's contained several sexual conversations on the social messaging application Whisper between the device user and other Whisper users who identified as minor females. In other chat conversations on the phone, the user repeatedly expressed interest in raping and beating children, including infant- and toddler-aged children; discussed paying for sex with children while traveling overseas; claimed to have sexually abused children under the age of 18 months; and claimed to have abused his ex-wife's son at "bath time and toilet time." The analysis also located CSAM depicting an infant being sexually abused by an adult male in the unallocated space of the phone. The metadata indicated that the device had last been used on October 8, 2019.

- A Samsung S20 Android cellular phone identified as MCLEAN's contained in its "user dictionary" the user names "twisteddesire"

Defendant's Initials             31

and gnoles3213@gmail.com.   No CSAM was identified on the phone, but agents found a text message on March 10, 2021, from L.H. to MCLEAN—the same day as the JSO knock and talk—that stated, "Cops were here reg kick app ?"   The forensic analysis showed that after the text message from L.H., MCLEAN installed several "device cleaning" applications on the Samsung S20.   Agents subsequently interviewed L.H., who acknowledged calling and texting MCLEAN after JSO visited the house.   L.H. said he had no knowledge of MCLEAN's involvement with child pornography. He provided consent to search his phone and no contraband was located.

- A green Western Digital Hard Drive s/n WXE507092327 was found in the closet of a bedroom where another individual, M.M., stayed off-and-on at the residence.   Agents also found in the closet several of MCLEAN's uniforms and a plastic bin of his belongings. (Agents interviewed M.M., who denied recognizing or possessing the hard drive.)   The hard drive bore a marking stating that it was manufactured in Thailand.   Five video files containing CSAM were found on the hard drive, including one which had been deleted.   The file name for one of the videos was "! dad balls deep into 6yo son 20110227181031-tnrdswnvpjtvfnlcn.flv",   and   the   metadata indicated that it had been created on September 7, 2013, and last accessed on November 5, 2015.

- A USB 2.0 flash drive (with a "Vincennes University" branding mark), which contained two video files of CSAM which appeared to be the same as two of the video files on the Western Digital hard drive.

- A Sony laptop computer, which reflected the usage of both the IP addresses 216.237.98.68 (from which the CSAM was distributed in Rhode Island) and 162.225.165.18 (MCLEAN's home address IP). The data on the computer also included an entry for email address

Defendant's Initials           32

twisteddesire3210@gmail.com having been used as a login for "doublelist.com," which is a classifieds, dating, and personals site.

- The Micro SD card concealed in the plastic plant, which contained approximately 20 files of anime depicting children engaged in sexually explicit conduct.

The defendant acknowledges there exists a sufficient forfeiture nexus between the assets discussed in this section of the factual basis and the offense of distributing child pornography. Specifically, the assets were used in the commission of the offense conduct and/or contained visual depictions of minors engaged in sexually explicit conduct.

E.  Identification of Classified Information

During the search of the residence on November 4, 2021, agents also located and seized a black Sony USB flash drive. Photographs taken during the warrant's execution revealed that the Sony flash drive was in plain view in a wooden tray, on top of a counter in MCLEAN's kitchen. The wooden tray was open at the top with no cover, lock, or other security measures to prevent someone from taking items from the tray. The wooden tray contained a variety of items, including several wireless garage door openers, a flashlight, cigarette lighters, nail clippers, lip balm, and several other miscellaneous items. The other individuals residing at the home did not claim ownership of the flash drive.

Defendant's Initials           33

An examiner at the cyber forensics laboratory in Linthicum, Maryland, reviewed this particular flash drive for CSAM and observed files containing age-indeterminate pornography. However, the examiner then identified a document ("Document A") which, upon opening, bore the United States Government classification marking "SECRET//NOFORN/25X1"[1] at the top. The document contained national defense information (NDI) and pertained to foreign governments and their military equipment, specifically combat aircraft and impact.    Upon identifying potentially classified material, the examiner stopped analyzing the flash drive.  A separate search warrant was obtained to review the drive for classified material (Case No. 22-mj-1583-MJM, D. Md.).

## II.    Unlawful Retention of National Defense Information

### A.    Background on Classified Information

Classified information is defined by Executive Order 13526 ("E.O. 13526"), and relevant preceding Executive Orders, as information in any form that: (1) is owned by, produced by or for, or under the control of the United States

---

[1]    "NOFORN/25X1" means the information is "NOT RELEASABLE TO FOREIGN NATIONALS. "X1" is an marking signifying an exemption from automatic declassification in cases involving information that may reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or security service of a foreign government or international organization, or a non-human intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development.

Defendant's Initials               34

government; (2) falls within one or more of the categories set forth in E.O. 13526; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security. Where such unauthorized disclosure reasonably could be expected to cause "damage" to the national security, the information is classified as "Confidential." Where such unauthorized disclosure reasonably could be expected to cause "serious damage" to the national security, the information is classified as "Secret." Where such unauthorized disclosure reasonably could be expected to cause "exceptionally grave damage" to the national security, the information is classified as "Top Secret."

Pursuant to E.O. 13526, a person may gain access to classified information only if a United States agency head or agency head's designee has determined that the person is eligible to access classified information, the person has signed an approved nondisclosure agreement, and the person has a "need-to-know" the classified information. "Need-to-know" means that an authorized holder of classified information has determined that a person requires access to specific classified information in order to perform, or assist in, a lawful and authorized government function.

Classified information may not be removed from the controlling agency's premises without permission.

Defendant's Initials           35

B.    MCLEAN's Access to Classified National Defense Information

Background checks and USN training records revealed that MCLEAN
has held a government security clearance since his commissioning as a naval officer
in April 2006.  Because of his job duties, and through all times relevant to the
Superseding Information, the defendant held a Top Secret security clearance with
access to Sensitive Compartmented Information (SCI).  A Department of Defense
(DoD) database confirmed MCLEAN was last granted a Top Secret//SCI clearance
on or about March 7, 2016.  As such, throughout his USN service, the defendant
entered into various agreements with the United States regarding the protection and
proper handling of classified information, and he received extensive annual training
regarding classified NDI.  USN records show that MCLEAN signed a Classified
Information Nondisclosure Agreement (NDA) on or about April 28, 2006, which
was the date of his Officer Appointment Acceptance and Oath of Office.  Most
recently, on or about February 18, 2020, MCLEAN signed a Personal Attestation
regarding the "Reporting Obligations for Continued Access to Classified
Information," which affirmed his agreement to abide by all conditions and
responsibilities for accessing Top Secret Information and classified materials of any
nature or kind.

NCIS interviewed the Command Security Manager (CSM) for
MCLEAN's USN parent command, who oversaw all the command's security and

Defendant's Initials _____          36

clearance issues. The CSM affirmed that at no time was any command member (including the defendant) allowed to maintain classified material at his residence. The CSM further advised that command members (including the defendant) are not authorized to store classified materials on thumb drives, nor are they authorized to maintain classified materials outside of secure controlled spaces.

C.     Criminal Retention of NDI by MCLEAN

After executing of the search warrant on the black Sony flash drive recovered from MCLEAN's residence, agents with NCIS and Federal Bureau of Investigation (FBI) identified approximately 200 classified files and documents containing NDI, including Document A. Specifically, there were approximately 150 documents classified at the Secret level and 50 documents classified at the Confidential level. The original classification dates on these documents ranged from 1997 through 2008. Among the unclassified contents of the flash drive were MCLEAN's USN "Fitness Report & Counseling Record (W2-O6)" dated November 21, 2018, and files containing age-indeterminate pornography.

The classified information contained in these approximately 200 documents and files was controlled by various United States Government entities. Based on MCLEAN's intelligence-related official duties and, among other things, the trainings he received and his execution of multiple NDAs throughout his career as a naval officer, the defendant knew the information contained in the above-

Defendant's Initials            37

described files was classified NDI and that he was not authorized to possess or retain those materials in his house.

In addition to Document A described above—which constituted NDI, the unauthorized disclosure of which could reasonably be expected to cause serious damage to the national security—NCIS and FBI identified Document B, which is a presentation which reveals intelligence sources and methods on how the U.S. Intelligence Community understands and assesses foreign naval capabilities. The slides in the presentation were marked Secret//NOFORN and Secret//REL TO USA, AUS, CAN, GBR//MR level,[2] and constituted NDI. Disclosure of the information contained in the presentation to an adversary could result in the loss of future access to this information, the loss of significant taxpayer investment, and potentially the loss of U.S. ships and lives.

The defendant was aware that Document A and Document B were classified and contained NDI, and that retaining Document A and Document B (and the other files containing classified material) on the flash drive at his residence put U.S. national security at risk. MCLEAN's residence was not a location authorized to store classified information, and the defendant knew as much. Having

---

[2]    "REL TO USA, AUS, CAN, GBR//MR" signifies the information is releasable only to U.S. citizens and foreign nationals of specified countries and international organizations, or multinational forces. "MR" is a legacy classification marking meaning "manual review."

Defendant's Initials                38

unauthorized possession of the flash drive containing Document A and Document B, both of which related to the national defense, the defendant willfully retained Document A and Document B and failed to deliver them to an officer or employee of the United States entitled to receive them.



# EXHIBIT B

Character reference for Gregory Edward McLean.

A good son that has always been driven to make me and his mother proud of his accomplishments.

Speaking as Gregs father, I have had the privilege of watching him grow from a child into the man he is today.  Intelligent, responsible, loving and caring.

Driven for success with natural leadership abilities. He got involved in Scouting and served as pack leader in Cub scouts and Troop leader in Boy scouts. Honor, courage and commitment have been embedded in his whole life.

A problem solver that evaluates the situation at hand and effectively determines what is needed to take corrective action for a positive resolution.

He entered high school as a chubby overweight kid that sometimes got made fun of by the other kids. He joined the NROTC program at Andrew Jackson high school and was told he probably wouldn't make it because of his weight. He started a rigorous physical fitness program and dropped about 60 pounds over his first year there. He was assigned as the fitness instructor for the remainder of his time there. He graduated as an honor role student and was awarded a bright future scholarship to Florida State university. He graduated with a degree in Information technology and was commissioned in the US Navy as an Ensign.

His accomplishments while serving in the US Navy speaks for itself. He has served proudly and successfully in every assignment given. The fact that he was selected as the Executive Officer for a Naval ship command shows that he has earned the respect and admiration of his peers.

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:   3:22-cr-115(S1)TJC-JBT** |
| **Gregory Edward McLean** | ) | |
| **aka "twisteddesire3210" and** | ) | |
| **"twisteddesire3213"** | ) | |

**Prepared for:**    The Honorable Timothy J. Corrigan
Chief United States District Judge

**Prepared by:**    Irish Anderson
Senior United States Probation Officer
Jacksonville, FL
(904) 301-6445
Irish_Anderson@flmp.uscourts.gov

**Assistant U.S. Attorney**
David B. Mesrobian
300 N. Hogan Street
Suite 700
Jacksonville, FL 32202
(904) 301-6300
david.mesrobian@usdoj.gov

**Defense Counsel**
James Paul Hill
james@tassonelaw.com

Jesse Nolan Dreicer
jesse@tassonelaw.com

1833 Atlantic Boulevard
Jacksonville, FL 32207
(904) 396-3344

**Sentence Date:**    March 19, 2024 11:00 AM

**Offenses:**    **Count 1**:
Distribution of a Visual Depiction, the Production of which Involved the Use of a Minor Engaging in Sexually Explicit Conduct
18 U.S.C. §§2252(a)(2) and 2252(b)(1)
5 years to 20 years imprisonment/$250,000 fine
(Class C Felony)

**Count 2**:
Unlawful Retention of National Defense Information
18 U.S.C. § 793(e)
Not more than 10 years imprisonment/$250,000 fine
(Class C Felony)

**Release Status:**    September 19, 2022; arrested and detained.

**Date Report Prepared:** 2/13/24        **Date Report Revised:** 3/11/24

**RE:  McLean, Gregory Edward**

**Detainers:**         None.

**Codefendants:**      None.

**Related Cases:**     None.

RE: McLean, Gregory Edward

**Identifying Data:**



| | |
|---|---|
| **Date of Birth:** | December 28, 1983 |
| **Age:** | 40 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |

| | |
|---|---|
| **SSN#:** | 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 |
| **FBI#:** | 47006FG0 |
| **USM#:** | 22100-510 |
| **State ID#:** | Not assigned |
| **PACTS#:** | 8215973 |

| | |
|---|---|
| **Education:** | Bachelor's Degree (unverified) |
| **Dependents:** | 1 (wife) |
| **Citizenship:** | U.S. Citizen |
| **Country of Birth:** | Cuba (military installation) |
| **Place of Birth:** | Guantanamo Bay, Cuba |

| | |
|---|---|
| **Legal Address:** | Nassau County Jail |
| | 76212 Nicholas Cutinha |
| | Yulee, Florida 32097 |

| | |
|---|---|
| **Last Address:** | 13063 Bentwater Drive |
| | Jacksonville, Florida 32246 |

| | |
|---|---|
| **Alias(es):** | Also Known As: McLean, Gregory |

| | |
|---|---|
| **Alternate IDs:** | None. |

***Restrictions on Use and Redisclosure of Presentence Investigation Report.*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

RE:  McLean, Gregory Edward

**PART A. THE OFFENSE**

**Charge(s) and Conviction(s)**

1.   On September 8, 2022, a Middle District of Florida, Jacksonville Division grand jury returned a three-count Indictment naming Gregory Edward McLean, aka, "twisteddesire3210" and "twisteddesire3213," as defendant.

2.   On November 20, 2023, the United States Attorney's Office filed a two-count Superseding Information naming Gregory Edward McLean, aka, "twisteddesire3210" and "twisteddesire3213," as defendant.

3.   Count One of the Superseding Information charges that on November 17, 2020, in the Middle District of Florida, and elsewhere, the defendant did knowingly distribute a visual depiction using any means and facility of interstate and foreign commerce by any means, that is, via the internet, when the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct, the visual depiction being specifically identified in the computer file with a title ending in "1270d.mp4," in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

4.   Count Two of the Superseding Information charges that beginning on an unknown date and continuing through November 4, 2021, in the Middle District of Florida, the defendant, having unauthorized possession of, access to, and control over documents relating to the national defense, willfully retained the documents and failed to deliver them to the officer or employee of the United States entitled to receive them, to wit, the defendant without authorization retained a thumb drive in his residence which contained two documents classified at the Secret level relating to the national defense that discussed foreign military capabilities, in violation of 18 U.S.C. § 793(e).

5.   The Superseding Information contains a forfeiture provision pursuant to 18 U.S.C. § 2253 and seeks to forfeit a Motorola Droid Turbo cellular telephone, a Samsung Galaxy S20 Ultra cellular telephone, a Western Digital hard drive, and a Flash Drive USB2.0.

6.   On December 6, 2023, the defendant appeared before United States Magistrate Judge Joel B. Toomey and, pursuant to a written plea agreement, pleaded guilty to Counts One and Two of the Information. On December 14, 2023, Chief United States District Judge Timothy J. Corrigan accepted the defendant's plea and adjudged him guilty.

7.   Pursuant to the plea agreement, the defendant will waive the right to be charged by way of indictment before a federal grand jury.

8.   At the time of sentencing, the original Indictment against the defendant will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

**RE:  McLean, Gregory Edward**

9.     Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree that, although not binding on the United States Probation Office or the Court, they will jointly recommend that the Court impose concurrent sentences for Counts One and Two of the Information. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

10.    The defendant has been advised and understands, that under the Sex Offender Registration and Notification Act, a federal law, the defendant must register and keep the registration current in each of the following jurisdictions: the location of the defendant's residence, the location of the defendant's employment; and, if the defendant is a student, the location of the defendant's school. The defendant understands that failure to comply with these obligations subjects the defendant to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

11.    Pursuant to 18 U.S.C. §§ 3663(a)(3), 3663A(a) & (b), 18 U.S.C. § 3664, 18 U.S.C. § 2248, and 18 U.S.C. § 2259, the defendant agrees to make full restitution to all minor victims of his offenses as to the counts charged. Further, the defendant agrees to pay restitution to any of his minor victims, for the entire scope of his criminal conduct, including but not limited to all matters included as relevant conduct. The defendant acknowledges and agrees that this criminal conduct (or relevant conduct) includes any minor victim of any child pornography offenses, charged or uncharged, under Chapter 110, United States Code, and any minor victim of any violation of federal and / or state law committed by the defendant, including any contact sexual offense. Further, pursuant to 18 U.S.C. § 3664(d)(5), the defendant agrees not to oppose bifurcation of the sentencing hearing if the victims' losses are not ascertainable prior to sentencing. Pursuant to 18 U.S.C. § 2259, if the Court orders restitution, the mandatory minimum amount must not be less than $3,000 per victim.

12.    Pursuant to a written plea agreement, the government will recommend a two-level reduction for acceptance of responsibility. This is conditioned upon the defendant clearly demonstrating acceptance of responsibility for the offense. USSG §3E1.1(a). If the offense level is 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of the misconduct by timely notifying authorities of intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently, the offense level can be decreased by one additional level. USSG §3E1.1(b).

13.    The defendant agrees to forfeit all rights, title, and interest in all assets, which are subject to forfeiture, as outlined in the written plea agreement. The assets to be forfeited specifically include, but are not limited to, a Motorola Droid Turbo cellular telephone, a Samsung Galaxy S20 Ultra cellular telephone, a green Western Digital Hard Drive s/n WXE507092327, and a Flash Drive USB2.0 (marked "Vincennes University"), which assets were used in the commission of the offense conduct and contained visual depictions of minors engaged in sexually explicit conduct.

**RE: McLean, Gregory Edward**

14.    The United States and defendant hereby agree that any computer equipment as defined in 18 U.S.C. § 2256, seized from the defendant and currently in the custody and/or control of the Federal Bureau of Investigation or other appropriate agency, were properly seized and are subject to forfeiture to the government according to 18 U.S.C. §§ 2253 or 2254, and/or that the computer equipment and peripherals constitute evidence, contraband, or fruits of the crime for which he has pled guilty. As part of the plea agreement in this case, defendant hereby states under penalty of perjury that he is the sole and rightful owner of the property, and that defendant hereby voluntarily abandons all right and claim to and consents to the destruction of the following:

a. Black Motorola Cell Phone;

b. Black iPhone;

c. Black Sony VAIO Laptop SN #27527431, Model #PCG-81115L;

d. Grey Apple MacBook Air, SN #FVFOQM5GMNHP;

e. Black Seagate Free Agent Go, 500 GB, SN #2GE2CW67;

f. Black Sony 1GB USB storage device SN #07151CDAV;

g. Dane-Elec Silver and Black USB storage device on a Silver Chain;

h. ATP tough Drive, 2GB, Camo Pattern with silver clip SN#AF2GUFT3CAD;

i. Clear case containing SanDisk Micro SD Adapter and a SanDisk Ultra Plus 32 GB Micro SD Card SN#7141DRAY304V;

j. PNY 16GB, Black and White USB storage device;

k. Kingston Data Traveler 1GB USB storage device;

1. Grey USB storage device with a green clip attached;

m. Silver and Blue Nokia Cingular Cell Phone;

n. Teal USB storage device;

o. T-Mobile LG Cellphone in a Pink, White and Black plaid case;

p. Black Verizon cellphone in a black Otterbox case;

q. PNY 32GB Micro SD Card; and

r. Assorted optical discs.

RE:  McLean, Gregory Edward

### The Offense Conduct

**Distribution of Child Pornography**

Initial Investigation

15.   In April 2021, the Naval Criminal Investigative Service (NCIS) received a tip from state law enforcement in Rhode Island that 10 files containing child sexual abuse material (CSAM) had been shared by a user of Kik/Medialab (Kik), a messaging application, with other users between August 24, 2020, through September 16, 2020. The files constituted nine videos and one still image of CSAM. One of the files was a video depicting a partially clothed adult male inserting his penis into the anus of an infant.

16.   State law enforcement shared the Kik account information it obtained for the user who uploaded the CSAM, which was:

Email address: twisteddesire3210@gmail.com
Screen/username: twisteddesire3210_keg
Internet Protocol (IP) Address: 216.237.98.68

17.   The investigation showed that this IP address resolved to a particular hotel in Middletown, Rhode Island. State law enforcement had previously executed search warrants in connection with their investigation, including on the Kik account.

18.   The information provided by Kik showed that the user of the "twisteddesire3210" account had also logged into the account from Jacksonville, using the IP address 162.225.165.18. According to information from the service provider, the IP address was assigned to Gregory Edward McLean, at his home address located on Bentwater Drive, Jacksonville. Investigation revealed that email address "gnole3213@att.net" was associated with the IP address from November 2, 2018, through January 15, 2021. Further, authorities learned that with respect to the "twisteddesire3210" account name, the digits "3210" were associated with McLean's personal identifying information.

19.   Rhode Island authorities advised NCIS of the foregoing because at that time, McLean was an active-duty officer in the United States Navy (USN), with the rank of Lieutenant Commander and serving as the Executive Officer (XO) of the U.S.S. Minneapolis-Saint Paul (LCS-21) stationed aboard Naval Station (NS) Mayport, Florida. Through USN records, NCIS confirmed that McLean was staying in Rhode Island on official travel during the time of the Kik uploads. Specifically, McLean was on temporary duty at NS Newport, Rhode Island, between July 11, 2020, and September 25, 2020, as a student at the Surface Warfare Officers School. Middletown is just outside of NS Newport. Further, legal process from the hotel in Middletown confirmed that McLean was staying at the hotel during the same timeframe.

20.   The data obtained from Kik also showed logins to the twisteddesire3210_keg account from Dubai on October 20, 2019; Bahrain on October 26, 2019; and a hotel in Marinette, Wisconsin, from approximately June 13, 2020, through June 20, 2020. USN records showed that McLean was on official travel in those three locations on those dates.

RE: McLean, Gregory Edward

21.     Subsequently, NCIS discovered another tip made to the National Center for Missing and Exploited Children (NCMEC) dated December 1, 2020. The tip information reported the upload of five CSAM files by a Kik user on November 17, 2020. The account which uploaded the files had the username "twisteddesire3213." Information obtained from Kik revealed the following subscriber information:

Email address: joesmith32103210@gmail.com
Screen/username: twisteddesire3213_113
IP Address: 162.225.165.18
Phone type: Android

22.     The IP address from which the user distributed the CSAM was the same Jacksonville-based IP address previously identified as assigned to McLean at his Bentwater Drive home. The CyberTip reported five files (four videos and one image) sent within a few minutes of each other on November 17, 2020, using the private chat message function. Two of the video files distributed are described as follows:

**File name: 25984456-72bf-4ec2-8ad2-299fe701270d.mp4, uploaded to Kik on November 17, 2020, at approximately 16:02:15 UTC:**

*This is a color video, with sound, approximately 64 seconds in length. In the beginning of the video, a completely nude pre-pubescent female child wearing a mask, is lying on her back on what appears to be a bed. An adult male is holding one of the child's legs while inserting what appears to be a sex toy into the child's vagina. The camera then zooms into a close-up, and the sex toy is removed and the adult states, "You spread that pussy wide open you fucking cunt," as the child spreads open her vulva with her hands. The adult states, "You like being raped?" and the child responds, "Yes." The adult states, "Do you want to be raped again?" and the child responds, "Yes." The adult orders the child to insert a finger into her vagina and the child complies by inserting one finger and begins to masturbate. The camera zooms out and video ends. The female in the video is a pre-pubescent child based on the overall size of her body, child-like features, lack of breast development, and lack of pubic hair. This file was identified by National Center for Missing and Exploited Children NCMEC)to contain a child victim previously identified by law enforcement.*

**File name: e790c854-586a-44c0-b3df-f8ea788457f0.mp4, uploaded to Kik on November 17, 2020, at approximately 16:06:25 UTC:**

*This is a color video, with sound, approximately 28 seconds in length. In the beginning of the video, a completely nude pre-pubescent female child is on her hands and knees on what appears to be a bed. An adult male is visible behind her masturbating with his hand on her buttocks. The child then states, "Fuck me in the ass." The camera switches the adult's point of view and the adult attempts to insert his penis into the child's anus and the child cries out. The view is switched a third time, with the male now holding the child with both hands and penetrating her from the rear as she is bent forward. As the male thrusts his hips, she cries loudly and video ends. The female in the video is a pre-pubescent child based on the overall size of her body, child-like features, lack of breast development, and lack of pubic hair.*

**RE: McLean, Gregory Edward**

 JSO Knock and Talk

23.   Unrelated to the federal investigation, on March 10, 2021, a detective with the Jacksonville Sheriff's Office (JSO) went to McLean's residence on Bentwater Drive for the purpose of conducting a knock-and-talk regarding one of the same CSAM-related CyberTips that resolved back to the address. The detective spoke McLean's father-in-law who denied any knowledge of Kik or child pornography.

Execution of Federal Search Warrant and Interviews

24.   On November 4, 2021, agents executed a federal search warrant at McLean's Bentwater Drive residence. McLean, his father-in-law, his wife, and other family members were present.

25.   Agents interviewed Cynthia McLean (defendant's wife), and she advised that McLean previously had a Kik account but that she believed he had shut it down. She could not provide McLean's username. Further, Cynthia advised that McLean used an Android cellphone.

26.   Agents also interviewed McLean. He admitted using Kik but stated that his username was "backwoodsredneck." The defendant also claimed not to have used Kik for more than one year. Further, he denied using the sequenced numbers 3210 and 3213 for any accounts or usernames (despite 3210 being associated with his personal identifying information, and USN records reflecting that his personal email was gnole3213@gmail.com). He further denied engaging in any activity related to child pornography. However, he acknowledged staying at the hotel in Rhode Island and using his laptop and Android telephone while there. McLean stated that he may have used Kik while staying in Rhode Island, but he could not remember. The defendant also admitted lodging at the hotel in Marinette, Wisconsin.

27.   Agents observed McLean shaking during the interview, and he commented that he could not stop shaking. He further stated, "I understand that no matter what, with this process, it's something that I'm going to have to go through and that my career is probably over and everything else." McLean's interview was recorded.

28.   Agents searched McLean's residence and seized numerous electronic devices and storage media, of which the other individuals living at the residence denied ownership. Florida Department of Law Enforcement K9 Maple was used to search the residence, during which the K9 alerted to a plastic plant in the sunroom. Upon closer inspection, agents discovered a Micro SD card concealed within the fake soil of the plastic plant.

RE:  McLean, Gregory Edward

Forensic Analysis of Seized Devices

29.   The seized devices and media were submitted for forensic review and the results of the analysis included:

a)   A Motorola Droid Turbo XT-1254 Android cellular phone identified as McLean's contained several sexual conversations on the social messaging application Whisper between McLean and other Whisper users who identified as minor females. In other chat conversations on the phone, McLean repeatedly expressed interest in raping and beating children, including infant and toddler aged children; discussed paying for sex with children while traveling overseas; claimed to have sexually abused children under the age of 18 months; and claimed to have abused his ex-wife's son at "bath time and toilet time." The analysis also located CSAM depicting an infant being sexually abused by an adult male in the unallocated space of the phone. The metadata indicated that the device had last been used on October 8, 2019.

30.   Examples of the defendant expressing interest in raping and beating children to another Whisper user is as follows:

*March 2017*

*McLean: Can I take them by force?*
*Whisper user: Mmmm rape is prefarable*
*McLean: You've got your guy. How old are they?*
*Whisper user: 17 15 and 11*
*McLean: perfect Can I do all I want?*
*Whisper user: No limits*
*McLean: Are they cute? Virgins?*
*Whisper user: Yes and yes*
*McLean: Mmmm Any special requests?*
*Whisper user: nope just take it as far as you can go*
*McLean: That's very very far. Pics?*

*March 2017, continued*

*Whisper user: How old are yours?*
*McLean: Still trying to have one. Baby sat the neighbors over the weekend and got me hard as hell*
*Whisper user: Nice. What age?*
*McLean: 18 months*
*Whisper user: Damn your start early ;)*
*McLean: Yep lol. I prefer older but was so hot.*

**RE:  McLean, Gregory Edward**

31.   The analysis of the seized devices and media submitted for forensic review also included the following results:

  a)  A Samsung S20 Android cellular phone identified as McLean's contained in its "user dictionary" the usernames "twisteddesire" and "gnoles3213@gmail.com." No CSAM was identified on the phone, but agents found a text message on March 10, 2021, from McLean's father-in-law to McLean the same day as the JSO knock and talk that stated, "Cops were here ref kick app?" The forensic analysis showed that after the text message from the defendant's father-in-law, McLean installed several "device cleaning" applications on the Samsung S20. Agents subsequently interviewed the defendant's father-in-law, and he admitted calling and texting McLean after JSO visited the house. He stated that he had no knowledge of the defendant's involvement with child pornography. He provided consent to search his phone and no contraband was located.

  b)  A green Western Digital Hard Drive sin WXE507092327 was found in another individual's bedroom closet. Agents also found in the closet several of McLean's uniforms and a plastic bin of his belongings. The hard drive bore a marking stating that it was manufactured in Thailand. Five video files containing CSAM were found on the hard drive, including one which had been deleted. The file name for one of the videos was "! dad balls deep into 6yo son 20110227181031-tnrdswnvpjtvfnlcn.flv", and the metadata indicated that it had been created on September 7, 2013, and last accessed on November 5, 2015.

  c)  A USB 2.0 flash drive (with a "Vincennes University" branding mark), which contained two video files of CSAM which appeared to be the same as two of the video files on the Western Digital hard drive.

  d)  A Sony laptop computer, which reflected the usage of both the IP addresses 216.237.98.68 (from which the CSAM was distributed in Rhode Island) and 162.225.165.18 (McLean's home address IP). The data on the computer also included an entry for email address twisteddesire3210@gmail.com having been used as a login for "doublelist.com," which is a classifieds, dating, and personals site.

  e)  The Micro SD card concealed in the plastic plant, which contained approximately 20 files of anime depicting children engaged in sexually explicit conduct.

32.   Since the offense involved approximately 20 videos[1] and three images, for a total of approximately 1,503 images.

---

[1] Each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images. USSG §2G2.2, comment. (n.6(B)(ii))

RE: McLean, Gregory Edward

Identification of Classified Information

33.  During the November 4, 2021, search of the residence, agents also seized a black Sony USB flash drive. Photographs taken during the warrant's execution revealed that the Sony flash drive was in plain view in a wooden tray, on top of a counter in McLean's kitchen. The wooden tray was open at the top with no cover, lock, or other security measures to prevent someone from taking items from the tray. The wooden tray contained a variety of items, including several wireless garage door openers, a flashlight, cigarette lighters, nail clippers, lip balm, and other miscellaneous items. The other individuals residing at the home did not claim ownership of the flash drive.

34.  An examiner at the cyber forensics' laboratory in Linthicum, Maryland, reviewed the flash drive for CSAM and observed files containing age indeterminate pornography. However, the examiner also identified a document (Document A) which, upon opening, bore the United States Government classification marking "SECRET//NOFORN/25X1"[2] at the top. The document contained national defense information (NDI) and pertained to foreign governments and their military equipment, specifically combat aircraft and impact. Upon identifying potentially classified material, the examiner stopped analyzing the flash drive. A separate search warrant was obtained to review the drive for classified material (Case No. 22-mj-1583-MJM, D. Md.).

**Unlawful Retention of National Defense Information**

Background on Classified Information

35.  Classified information is defined by Executive Order 13526 ("E.O. 13526"), and relevant preceding Executive Orders, as information in any form that: (1) is owned by, produced by or for, or under the control of the United States government; (2) falls within one or more of the categories set forth in E.O. 13526; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security. Where such unauthorized disclosure reasonably could be expected to cause "damage" to the national security, the information is classified as "Confidential." Where such unauthorized disclosure reasonably could be expected to cause "serious damage" to the national security, the information is classified as "Secret." Where such unauthorized disclosure reasonably could be expected to cause "exceptionally grave damage" to the national security, the information is classified as "Top Secret."

---

[2] "NOFORN/25X1" means the information is NOT RELEASABLE TO FOREIGN NATIONALS. "X1" is a marking signifying an exemption from automatic declassification in cases involving information that may reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or security service of a foreign government or international organization, or a non-human intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development.

RE: McLean, Gregory Edward

36.     Pursuant to E.O. 13526, a person may gain access to classified information only if a United States agency head or agency head's designee has determined that the person is eligible to access classified information, the person has signed an approved nondisclosure agreement, and the person has a "need-to-know" the classified information. "Need-to-know" means that an authorized holder of classified information has determined that a person requires access to specific classified information in order to perform, or assist in, a lawful and authorized government function.

37.     Classified information may not be removed from the controlling agency's premises without permission.

McLean's Access to Classified National Defense Information

38.     Background checks and USN training records revealed that McLean has held a government security clearance since being commissioned as a naval officer in April 2006. Because of his job duties, and through all times relevant to the Superseding Information, the defendant held a Top-Secret security clearance with access to Sensitive Compartmented Information (SCI). A Department of Defense (DoD) database confirmed McLean was last granted a Top Secret // SCI clearance on March 7, 2016. As such, throughout his USN service, the defendant entered into various agreements with the United States regarding the protection and proper handling of classified information, and he received extensive annual training regarding classified NDI. USN records show that McLean signed a Classified Information Nondisclosure Agreement (NDA) on April 28, 2006, which was the date of his Officer Appointment Acceptance and Oath of Office. Most recently, on February 18, 2020, McLean signed a Personal Attestation regarding the "Reporting Obligations for Continued Access to Classified Information," which affirmed his agreement to abide by all conditions and responsibilities for accessing Top Secret Information and classified materials of any nature or kind.

39.     NCIS interviewed the Command Security Manager (CSM) for McLean's USN parent command, who oversaw all the command's security and clearance issues. The CSM affirmed that at no time was any command member (including the defendant) allowed to maintain classified material at his residence. The CSM further advised that command members (including the defendant) are not authorized to store classified materials on thumb drives, nor are they authorized to maintain classified materials outside of secure controlled spaces.

Criminal Retention of NDI by McLean

40.     After executing of the search warrant on the black Sony flash drive recovered from McLean's residence, agents with NCIS and Federal Bureau of Investigation (FBI) identified approximately 200 classified files and documents containing NDI, including Document A. Specifically, there were approximately 150 documents classified at the Secret level and 50 documents classified at the Confidential level. The original classification dates on these documents ranged from 1997 through 2008. Among the unclassified contents of the flash drive were McLean's USN "Fitness Report & Counseling Record (W2-O6)" dated November 21, 2018, and files containing age-indeterminate pornography.

RE: McLean, Gregory Edward

41.   The classified information contained in these approximate 200 documents and files was controlled by various United States Government entities. Based on McLean's intelligence-related official duties and, among other things, the trainings he received and his execution of multiple NDAs throughout his career as a naval officer, the defendant knew the information contained in the above-described files was classified NDI and that he was not authorized to possess or retain those materials in his house.

42.   In addition to Document A described above-which constituted NDI, the unauthorized disclosure of which could reasonably be expected to cause serious damage to the national security, NCIS and FBI identified Document B, which is a presentation that reveals intelligence sources and methods on how the U.S. Intelligence Community understands and assesses foreign naval capabilities. The slides in the presentation were marked Secret// NOFORN and Secret//REL TO USA, AUS, CAN, GBR//MR level[3], and constituted NDI. Disclosure of the information contained in the presentation to an adversary could result in the loss of future access to this information, the loss of significant taxpayer investment, and potentially the loss of U.S. ships and lives.

43.   The defendant was aware that Document A and Document B were classified and contained NDI, and that retaining Document A and Document B (and the other files containing classified material) on the flash drive at his residence put U.S. national security at risk. McLean's residence was not a location authorized to store classified information, and the defendant knew as much. Having unauthorized possession of the flash drive containing Document A and Document B, both of which related to the national defense, the defendant willfully retained Document A and Document B and failed to deliver them to an officer or employee of the United States entitled to receive them.

### Victim Impact

Count One

44.   The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. Further, the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 is applicable in this case.

45.   Additionally, the victim identified in the Mother Full 20121 series submitted a restitution request "requesting all restitution that is available to help offset the costs of the victim's ongoing treatment and any future treatment that will be required." The offense of conviction is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the court shall determine the full amount of the identified victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000. 18 U.S.C. § 2259(b)(2).

---

[3] REL TO USA, AUS, CAN, GER/ /MR" signifies the information is releasable only to U.S. citizens and foreign nationals of specified countries and international organizations, or multinational forces. "MR" is a legacy classification marking meaning "manual review."

RE:  McLean, Gregory Edward

46.   The offense involved images from known child pornography series. The victims depicted in those series submitted victim impact statements that are attached to this report for review.

47.   Although the specific identities of the minors in the images and videos possessed by the defendant cannot all be determined, the activities portrayed in these images and videos undoubtedly inflicted harm to the children who endured the sexual assaults depicted in the images and videos. Furthermore, every instance of viewing images of child pornography represents a renewed violation of the privacy of victims and a repetition of their abuse. Pub. L. 109-248, Title V, Sec. 501, July 27, 2006, 120 Stat. 623.

### Adjustment for Obstruction of Justice

48.   The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

49.   The defendant appeared before United States Magistrate Judge Joel B. Toomey and entered a guilty plea. He subsequently met with the probation officer and reiterated his guilt. McLean commented that his participation in Count One was a "coping mechanism" he developed to manage his experiences in the Navy. The defendant did not elaborate on those experiences.

### Offense Level Computation

50.   The 2023 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

51.   When a defendant has been convicted of more than one count, the court shall: a) Group the counts resulting in conviction into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in §3D1.2.; b) Determine the offense level applicable to each Group by applying the rules specified in §3D1.3; c) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in §3D1.4. USSG §3D1.1

52.   Count Two, a conviction under 18 U.S.C. § 793(e) that references USSG §2M3.3, is excluded from grouping under USSG §3D1.2(d); therefore, the Adjusted offense level is determined by conducting a Multiple Count Adjustment, pursuant to USSG §3D1.4.

### Count 1: Distribution of a Visual Depiction, the Production of which Involved the Use of a Minor Engaging in Sexually Explicit Conduct

53.   **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 2252(a)(2) is USSG §2G2.2. The base offense level is 22. USSG §2G2.2(a)(2).          **22**

RE: McLean, Gregory Edward

54.  **Specific Offense Characteristics:** If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by 2 levels. Since McLean possessed an image of a prepubescent female child, two-levels are added. USSG §2G2.2(b)(2).                                                                 **+2**

55.  **Specific Offense Characteristics:** If the defendant knowingly engaged in distribution, other than distribution described in subdivisions (A) through (E), increase by 2 levels. Since McLean uploaded images of child sexual abuse material using Kik, two-levels are added. USSG §2G2.2(b)(3)(F).                          **+2**

56.  **Specific Offense Characteristics:** If the offense involved material that portrays (A) *sadistic or masochistic conduct or other depictions of violence*; or (B) sexual abuse or exploitation of an infant or toddler, increase by 4 levels. Since McLean possessed images of minor females being vaginally penetrated by an erect male penis and a sex toy, four levels are added. USSG §2G2.2(b)(4)(A).                              **+4**

57.  **Specific Offense Characteristics:** If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by 2 levels. Since McLean used Kik to distribute child pornography, two levels are added.  USSG §2G2.2(b)(6).                                             **+2**

58.  **Specific Offense Characteristics:** If the offense involved 600 or more images, increase by 5 levels. Since the offense involved approximately 1,503 images, five-levels are added. USSG §2G2.2(b)(7)(D).                                                          **+5**

59.  **Victim Related Adjustment:** None.                                                                **0**

60.  **Adjustment for Role in the Offense:** None.                                                       **0**

61.  **Adjustment for Obstruction of Justice:** None.                                                    **0**

62.  **Adjusted Offense Level (Subtotal):**                                                              **37**

**Count 2**: **Unlawful Retention of National Defense Information**

63.  **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 793(e) is USSG §2M3.3. The base offense level is 24. USSG §2M3.3(a)(2).                                           **24**

64.  **Specific Offense Characteristics:**  None.                                                        **0**

65.  **Victim Related Adjustment:** None.                                                                **0**

66.  **Adjustment for Role in the Offense:** The defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense; therefore, increase by two levels. USSG §3B1.3.                                                                 **+2**

67.  **Adjustment for Obstruction of Justice:** None.                                                    **0**

RE: McLean, Gregory Edward

68.  **Adjusted Offense Level (Subtotal):**                                                      **26**

69.  **Multiple Count Adjustment:** Units are assigned pursuant to USSG §3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count 1 | 37 | 1.0 |
| Count 2 | 26 | 0.0 |
| **Total Number of Units:** | | 1.0 |

70.  **Greater of the Adjusted Offense Levels Above:**                                          **37**

71.  **Increase in Offense Level:** The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at USSG §3D1.4.                        **0**

72.  **Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.                                                                        **37**

73.  **Chapter Four Enhancement:** None.                                                         **0**

74.  **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).                                                              **-2**

75.  **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).                                   **-1**

76.  **Total Offense Level:**                                                                    **34**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

*(NOTE: It is the policy of the probation office to assume all defendants were represented by effective counsel or knowingly waived counsel in convictions which occurred any time after 1972.)*

### Juvenile Adjudication(s)

77.  None.

RE:  McLean, Gregory Edward

### Adult Criminal Conviction(s)

78. None.

### Criminal History Computation

79. The total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

### Other Criminal Conduct

80. None.

### Pending Charges

81. None.

### Other Arrests

82. None.

## PART C. OFFENDER CHARACTERISTICS

*The defendant's wife corroborated some of the information in this section.*

### Personal and Family Data

83. Gregory Edward McLean was born on the United States military installation in Guantanamo Bay, Cuba, to the union of James McLean, age 65, and Barbara (*nee* Clontz) Moyer, age 64.

84. James McLean resides in Jacksonville and is a retired member of the United States Navy. Prior to his arrest, the defendant-maintained contact with his father approximately twice per year. They now speak weekly, according to the defendant's wife, and James is financially supportive of the defendant.

85. Barbara Moyer (mother) resides in Kentucky and is employed with Blue Cross and Blue Shield. Like with his father, McLean and his mother only spoke annually before his arrest but now are in weekly contact. The defendant's wife stated that Barbara also financially supports McLean.

86. McLean's parents divorced when he was approximately eight years old. However, they continued to "date each other" for the following 15 years. After the divorce, McLean was "lonely" because he spent a significant amount of time alone. He was mostly with his mother but did spend some weekends with his father. During one such weekend with his father, McLean came across his father's adult pornography, which intrigued him. Thereafter, he sought out the material, eventually developing an addiction that persisted until his arrest.

**RE: McLean, Gregory Edward**

87.  At some point during McLean's childhood, the defendant's parents married other people:

88.  The late Julee Rountree Sharrow served as the defendant's stepmother until her death in 2021. Before her death, Julee worked as an office manager.

89.  The late Randall Moyer and now Brian Hicks were McLean's stepfathers. Before his death, Randall worked for Blue Cross and Blue Shield. Brian resides in Kentucky with the defendant's mother, and his employment history is unknown.

90.  McLean's only sibling is stepsister, Stephanie Sharrow. Stephanie is approximately 42 years old. The defendant does not maintain a relationship with Stephanie.

91.  The defendant described his upbringing as "a very rough time." Adverse childhood experiences that reportedly continue to plague him and contributed to his involvement in Count One include early (age three) sexual contact with a neighbor and early (age eight), and consistent, viewing of pornography. McLean stated that "sex has always been a huge part of my life." The defendant's wife advised that she was aware of McLean's interest in adult pornography and had confronted him about it multiple times. Cynthia McLean stated that she believed McLean had stopped looking at pornography until authorities raided their home, and he admitted living with an addiction.

92.  Public records confirm McLean's prior marriage to Deanna Marie Perkins on September 9, 2006, in Clay County, Florida. The marriage dissolved in February 2009 prior to children being born. Deanna, age 40, and McLean do not maintain contact.

93.  McLean married Cynthia *nee* Sigler on June 13, 2015, in Duval County. Cynthia is 42 years old and is employed as a dental treatment coordinator. Cynthia admitted that when McLean was arrested, they were "distant" but working through marital problems. Currently, Cynthia intends to file for divorce and the same is related to historical problems including McLean's manipulation of her and his consistent infidelity. Cynthia reported that prior to McLean's arrest, she had confronted him about his infidelity with other women and that they sought marital counseling to repair the damage. However, since the defendant has been in custody, she learned that he was involved with men and women and that he was distributing child pornography and she does not want to remain married to him. The couple do not have children.

94.  McLean owns a home located at 13063 Bentwater Drive, Jacksonville. He shared the three-bedroom, two-bathroom home with his wife and in-laws before his arrest. The defendant has not developed a release plan and his wife advised he may not return to their family home after incarceration.

**Physical Condition**

95.  McLean is five feet, 11 inches tall, and 220 pounds. His hair is brown, and his eyes are blue. McLean may be distinguished by following tattoos: a tribal anchor (left arm); Hebrew writing and a martial arts symbol (right arm).

**RE:  McLean, Gregory Edward**

96.  McLean was historically treated for hypertension (Lisinopril); back spasms (Baclofen); and knee and shoulder pain (Naproxen). Before arrest, he was a patient at Naval Branch Health Clinic, Mayport. Medical records from the Nassau County Jail confirm his treatment for those ailments with the same medications. McLean is also prescribed extra-strength Tylenol and Chlorpheniramine (allergy medicine). Additionally, he was given a knee sleeve for stability and support.

97.  Prior to arrest, McLean smoked a package of cigarettes daily.

**Mental and Emotional Health**

98.  Regarding to his involvement in Count One, McLean advised that his conduct was a coping mechanism and a distraction from thinking about "things I've seen and experienced" as a child and while in the Navy. Without providing specific details, the defendant reported that during his first tour in Iraq, he "made decisions that continue to impact my mental health." When interviewed by jail authorities, the defendant reported having been diagnosed with post-traumatic stress disorder (PTSD) while in the Navy. His symptoms include hypervigilance and awaking from nightmares at least twice per week.

99.  Since being detained at Nassau County Jail, McLean reportedly met with a mental health professional several times and found the sessions helpful. When asked if he was interested in sustained treatment, he commented, "It can't hurt." McLean followed up by reporting that he is now a preacher and leads weekly church services at the jail.

100.  Medical records from the jail reflect McLean's use of the anti-depressant Cymbalta, 30mg, since January 2024.

101.  Based on his conviction in Count One, McLean will also be subject to sexual offender mental health treatment.

**Substance Abuse**

102.  A September 2022 urine sample yielded negative results for the presence of illicit substances.

103.  McLean denied a history of abusing drugs. He did, however, admit over-indulging in alcoholic beverages. He stated that he consumed alcohol weekly and always had "more than I should have." The defendant told jail staff that he consumed "around a half or a full bottle of whiskey daily" before his arrest. McLean cited work-related stress as the reason for consuming alcohol. The defendant has never participated in substance abuse treatment but is amenable to it.

104.  McLean's wife admitted knowing McLean consumed large amounts of alcohol. She stated that she attempted to talk with him about what she perceived as a problem but that he downplayed it.

RE:  McLean, Gregory Edward

### Educational, Vocational and Special Skills

105.    Records confirm that McLean graduated from Andrew Jackson High School, Jacksonville, in 2002 and that he earned a bachelor's degree in information science in August 2006 from Florida State University. His ending GPA was 3.18. When arrested, the defendant was actively enrolled in the Naval War College, Rhode Island, completing joint military educational requirements.

106.    The defendant has an interest in earning a counseling degree and hopes to begin the process while incarcerated. He also endeavors to start a church.

### Employment Record

107.    McLean has been a member of the United States Navy since April 2006. Since his detention in the instant offense, the defendant has been on "furlough without pay" status. McLean's last position was that of Lieutenant Commander. McLean served as the Executive Officer of the USS Minneapolis-Saint Paul and was stationed at Naval Station Mayport, Florida. He earned $10,800 monthly. McLean anticipates being discharged after sentencing.

### Financial Condition: Ability to Pay

108.    McLean completed a financial affidavit that listed his family home and a 2005 Ford-250 as his only assets[4]. Investigation revealed that those assets are valued at $322,935 and $2,621, respectively.

109.    The defendant does not presently have the ability to pay a fine or restitution, but if in custody, could participate in the Federal Bureau of Prison's Inmate Financial Responsibility Program and could adhere to a nominal payment schedule while serving a term of supervision.

## PART D. SENTENCING OPTIONS

### Custody

110.    **Statutory Provisions:** Count 1: The minimum term of imprisonment is five years, and the maximum term is 20 years. 18 U.S.C. §§ 2252(a)(2) and (b)(1). Count 2: The maximum term of imprisonment is 10 years. 18 U.S.C. § 793(e).

111.    **Guideline Provisions:** Based upon a total offense level of 34 and a criminal history category of I, the guideline imprisonment range is 151 months to 188 months.

### Impact of Plea Agreement

112.    The plea agreement does not affect the offense level or any other guideline computation.

---

[4] When arrested in September 2022, McLean reported additional assets that have now been liquidated for various financial reasons.

21

RE:  McLean, Gregory Edward

### Supervised Release

113.   **Statutory Provisions:** Count 1: The Court shall impose a term of supervised release of five years to life. 18 U.S.C. § 3583(k). Count 2: The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2).

114.   Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

115.   **Guideline Provisions:** Count 1: The statute requires a term of supervised release of five years; therefore, the guideline requirement for a term of supervised release is five years to life. USSG §5D1.2(b)(2). Count 2: Since the offense is a Class C Felony, the guideline range for a term of supervised release is 1 year to 3 years. USSG §5D1.2(a)(2).

### Probation

116.   **Statutory Provisions:** Count 1: The defendant is ineligible for probation because the defendant is subject to a minimum mandatory term of imprisonment. 18 U.S.C. § 3561(a)(3). Count 2: The defendant is ineligible for probation because the defendant will be sentenced at the same time to a term of imprisonment for the same or a different offense. 18 U.S.C. § 3561(a)(3).

117.   **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment. (n.2).

### Fines

118.   **Statutory Provisions:** Counts 1 and 2: The maximum fine is $250,000, per count. 18 U.S.C. § 3571(b).

119.   Counts 1 and 2: A special assessment of $100 is mandatory per count. 18 U.S.C. § 3013. The defendant is also subject to the provisions of the Justice for Victims of Trafficking Act of 2015. As to Count 1, in addition to the assessment imposed under section 3013, the court shall assess an amount of $5,000, per count, on any non-indigent person or entity convicted of an offense under 18 U.S.C. Chapters 77, 109A, 110, 117; or Section 274 of the Immigration and Nationality Act (8 U.S.C. § 1324). 18 U.S.C. § 3014.

120.   Further, as to Count 1, the defendant is also subject to the provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018. In addition to any other criminal penalty, restitution, or special assessment authorized by law, the court shall assess (1) not more than $17,000 on any person convicted of an offense under 18 U.S.C. § 2252(a)(4) or § 2252A(a)(5); (2) not more than $35,000 on any person convicted of any other offense for trafficking in child pornography; and (3) not more than $50,000 on any person convicted of a child pornography production offense. The court shall consider the factors in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572 when ordering this assessment. 18 U.S.C. § 2259A.

121.   **Guideline Provisions:** The fine range for this offense is from $35,000 to $350,000. USSG §5E1.2(c)(3).

RE: McLean, Gregory Edward

122.   Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated October 25, 2023, provides the following monthly cost data:

|  | Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $136.00 | $107.00 | $12.00 |
| Monthly | $4,147.00 | $3,266.00 | $366.00 |
| Annually | $49,770.00 | $39,197.00 | $4,387.00 |

**Restitution**

123.   **Statutory Provisions: Count 1:** Pursuant to 18 U.S.C. § 2259(c)(3), this is a child pornography trafficking offense and thus restitution is mandatory as set forth in 18 U.S.C. § 2259(b)(2). The court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the identified victim's (Mother Full 2021) losses, but which is no less than $3,000.

124.   **Guideline Provisions: Count 1:** Restitution is mandatory. USSG §5E1.1(a)(1)

**PART E. FACTORS THAT MAY WARRANT DEPARTURE**

*(NOTE: Presentation of information regarding departures in this section does not necessarily constitute a recommendation by the probation office for such departures.)*

125.   The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

**PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM**

*(NOTE: Presentation of information regarding variances in this section does not necessarily constitute a recommendation by the probation office for such variances.)*

126.   The probation office has reviewed the applicable statute at 18 U.S.C. § 3553(a)(1)-(7) and has not identified any factors that may warrant a sentence outside of the advisory guideline system. Furthermore, the parties have not advised the probation office of any factors which they believe warrant a sentence outside of the advisory range.

RE:  McLean, Gregory Edward

## PART G. NOTIFICATION OF SUPERVISION CONDITIONS

*(NOTE:  Presentation of information regarding special conditions in this section does not necessarily constitute a recommendation by the probation office for such special conditions.)*

127.   The Court in the Middle District of Florida imposes mandatory and standard conditions consistent with those set forth at USSG §5B1.3(a) and (c) and/or USSG §5D1.3(a) and (c). The  probation office has identified factors in the defendant's personal history and characteristics and/or the nature and circumstances of the offense that may warrant the following special conditions: sex offender mental health treatment; sex offender registration requirements; reasonable searches; computer and pornography restrictions; contact with minors' restrictions; financial disclosure and restrictions; substance abuse treatment; abstain from the use of alcohol.

Respectfully Submitted,

Joseph C. Collins
Chief U.S. Probation Officer

*/s/ Irish Anderson*

By:   Irish Anderson
Senior United States Probation Officer

Approved:

*/s/ Amanda L. Henry*

Amanda L. Henry
Supervisory United States Probation Officer

<u>Guidance for Use of Victim Impact Statement</u>

Title 18, United States Code, Section 3771(a) provides certain rights to victims of federal crimes. Those rights include the right to be reasonably protected from the accused, the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding, and the right to be treated with fairness and with respect for the victim's dignity and privacy.

If a U.S. Department of Justice employee fails to respect a victim's rights, a process is available by which the victim may file an administrative complaint. The Attorney General must take and 'investigate complaints relating to the provision or violation of the rights of a crime victim' and discipline may be imposed upon the employee for a 'willful or wanton' failure to protect a victim's rights. The complaint process is more fully described at 28 C.F.R. 45.10.

Title 18, United States Code, Section 3509(d) provides additional protections for crime victims who are under the age of 18 at the time of the proceeding, and includes specific procedures to protect the child's privacy.

To comply with the provisions of 18 U.S.C. § 3771(a)(1), (4), and (8), prosecutors should follow these guidelines when obtaining and using victim impact statements in child pornography cases:

1.   When providing this statement, the victim only consented to its use at sentencing, probation, or parole proceedings. Therefore, in order to respect the terms of the victim's consent, this statement should not be used for any other type of proceeding.

2.   Victims may withdraw or revise their statement. Therefore, prosecutors should obtain the statement as close as possible to the sentencing date for each individual defendant, in order to best ensure that the most up-to-date statement is used at that sentencing.
     a)   Once obtained, the statement should only be used in connection with the individual defendant being sentenced. Rather than re-using statements in subsequent sentencings, a victim impact statement should be obtained separately for each and every individual defendant being sentenced.

3.   The following measures will help protect the victim's safety, privacy, and dignity as provided in Section 3771(a)(1) and (8) and, if applicable, Section 3509(d):
     a)   The content of this statement should only be disclosed to the Court, the Probation Office, the defendant, and his counsel. The victim's personal or identifying information should be redacted from the statement.
     b)   Providing the statement to the Probation Office for inclusion in the pre-sentence report best protects the victim's privacy as those documents are not publicly available. If the statement is filed with the court by letter or as part of a sentencing memorandum, it should be filed under seal.
     c)   Prosecutors should avoid, where possible, referring to identifying information about the victim in open court.
     d)   The statement should be stored in a secure manner and location, and properly destroyed once the case is completed.

4.   When requesting a statement on behalf of a state or local prosecutor, prosecutors should either:
     a)   obtain a representation from the state or local prosecutor that there are comparable laws or procedures in the state or local jurisdiction that provide for the protection of a victim's safety, privacy, and dignity; or
     b)   obtain a representation from the state or local prosecutor that they agree to abide by these guidelines and the provisions in 18 U.S.C. § 3771(a)(1) and (8) (which provide that victims should be treated fairly and with respect for their safety, privacy, and dignity), and, in cases where the victims are still minors, 18 U.S.C. § 3509(d) (which provides certain privacy protections).
     c)   Only victim impact statements that are marked "federal, military, state, and local cases" can be provided to state and local prosecutors. If a statement is marked "federal and military cases only" it means that the victim has not provided consent for the statement to be used in any other type of criminal proceeding.

**Series Disclaimer: Mother Full 20121**

Current as of May 2023

As of May 2023, the parents of the minor victim in the MotherFull 20121 series are representing their child for purposes of seeking restitution with cases involving transportation, distribution, receipt, possession, accessing or advertising, however **the only restitution information available, at this time, is mentioned within the VIS itself.**

The parents are aware that the lack of supporting documentation regarding losses could prohibit restitution from being ordered.

A more substantive guidance document can be found on the CEOS Intranet here: https://dojnet.doj.gov/criminal/ceos/restitution/MotherFull-20121-Restitution-Guidance-2023.pdf


If you have any questions, please contact EOUSAs Victim Witness Program at: usaeo-vwpsc@usa.doj.gov.

This letter is to serve as a victim impact statement and restitution request in every case that DJMW is identified in as a victim. DJMW has suffered greatly as a result of the crime that was committed against her regarding the Mothefull2112 case and has been exploited sexually do to this crime. DJMW suffers severe anxiety attacks and has been diagnosed with anxiety, depression, visual and auditory hallucinations as a result of the crimes committed against her. She is in therapy weekly and is on several prescription medications to help her deal with the ongoing effects of this abuse.

While DJMW does everything that she can to lead a normal life the events of her past have severely impacted her health and well being and continues to cause her ongoing and severe mental health issues. The impact of the abuse that was inflicted upon her is massive and she will suffer its effects for the rest of her life.

Please consider this statement in every case that is brought to light as every time the video that was created is viewed, ▆▆▆▆ is again made a victim. The fact that this video is on the internet and cannot be stopped is an ongoing abuse that will impact her life and wellbeing for the foreseeable future.

We are also requesting all restitution that is available to help offset the costs of her ongoing treatment and any future treatment that will be required.


Thanks

T▆▆▆▆ ▆ ▆▆▆▆▆ and P▆▆▆ ▆▆▆▆▆▆▆▆▆.


Although most of DJMW expenses are covered through Medicaid there are still financial impacts to her and the rest of our family. I (T▆▆▆▆ ▆ ▆▆▆▆▆) have not been able to work a full-time job as I'm constantly having to be home for doctors appointments and counselling sessions (while my wife P▆▆▆ ▆▆▆▆▆▆▆▆▆ is the sole provider) in line with DJMW ongoing treatment. This impacts our family's ability for any meaningful saving and the ability for us to save for DJMW further education (College savings) or any extra funds that would go towards the betterment of DJMW quality of life. While I do not have a specific dollar amount available we would like to use any restitution available to help DJMW prepare for her future such as setting up a fund for college and being able to afford all of the expenses that come with her future educational plans. Without my ability to be able to work full time and focus my time and energy on DJMW we (our family) is greatly impacted and not able to set aside any significant saving for our child's future. The main goal of requesting restitution is to try and ensure my daughters future education, growth and well-being. In addition to cover DJMW future expenses once her Medicaid coverage stops.


Thank You

T▆▆▆▆ ▆ ▆▆▆▆▆ and P▆▆▆▆▆▆▆▆▆▆▆▆▆▆s

<u>Guidance for Use of Victim Impact Statement</u>

Title 18, United States Code, Section 3771(a) provides certain rights to victims of federal crimes.  Those rights include the right to be reasonably protected from the accused, the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding, and the right to be treated with fairness and with respect for the victim's dignity and privacy.

If a U.S. Department of Justice employee fails to respect a victim's rights, a process is available by which the victim may file an administrative complaint. The Attorney General must take and 'investigate complaints relating to the provision or violation of the rights of a crime victim' and discipline may be imposed upon the employee for a 'willful or wanton' failure to protect a victim's rights.  The complaint process is more fully described at 28 C.F.R. 45.10.

Title 18, United States Code, Section 3509(d) provides additional protections for crime victims who are under the age of 18 at the time of the proceeding, and includes specific procedures to protect the child's privacy.

To comply with the provisions of 18 U.S.C. § 3771(a)(1), (4), and (8), prosecutors should follow these guidelines when obtaining and using victim impact statements in child pornography cases:

1.  When providing this statement, the victim only consented to its use at sentencing, probation, or parole proceedings.  Therefore, in order to respect the terms of the victim's consent, this statement should not be used for any other type of proceeding.

2.  Victims may withdraw or revise their statement.  Therefore, prosecutors should obtain the statement as close as possible to the sentencing date for each individual defendant, in order to best ensure that the most up-to-date statement is used at that sentencing.

   a)  Once obtained, the statement should only be used in connection with the individual defendant being sentenced.  Rather than re-using statements in subsequent sentencings, a victim impact statement should be obtained separately for each and every individual defendant being sentenced.

3.  The following measures will help protect the victim's safety, privacy, and dignity as provided in Section 3771(a)(1) and (8) and, if applicable, Section 3509(d):

   a)  The content of this statement should only be disclosed to the Court, the Probation Office, the defendant, and his counsel. The victim's personal or identifying information should be redacted from the statement.

   b)  Providing the statement to the Probation Office for inclusion in the pre-sentence report best protects the victim's privacy as those documents are not publicly available.  If the statement is filed with the court by letter or as part of a sentencing memorandum, it should be filed under seal.

   c)  Prosecutors should avoid, where possible, referring to identifying information about the victim in open court.

   d)  The statement should be stored in a secure manner and location, and properly destroyed once the case is completed.

4.  When requesting a statement on behalf of a state or local prosecutor, prosecutors should either:

   a)  obtain a representation from the state or local prosecutor that there are comparable laws or procedures in the state or local jurisdiction that provide for the protection of a victim's safety, privacy, and dignity; or

   b)  obtain a representation from the state or local prosecutor that they agree to abide by these guidelines and the provisions in 18 U.S.C. § 3771(a)(1) and (8) (which provide that victims should be treated fairly and with respect for their safety, privacy, and dignity), and, in cases where the victims are still minors, 18 U.S.C. § 3509(d) (which provides certain privacy protections).

   c)  Only victim impact statements that are marked "federal, military, state, and local cases" can be provided to state and local prosecutors. If a statement is marked "federal and military cases only" it means that the victim has not provided consent for the statement to be used in any other type of criminal proceeding.

VICTIM IMPACT STATEMENT

Your Honor,

If someone produces and/or distributes CSAM, I believe they need to serve time incarcerated.
Many know me as "Tara," but few truly understand the impact that the production and distribution of CSAM has had on my life.

Imagine being a young teenager yearning to experience "normalcy" like others your age, but you did not have a normal childhood, remember? Because your name, face, and body have been plastered all over the dark web, you are threatened by online child predators. You are manipulated by consumers of CSAM online who pretend to befriend you, only to post your conversations in a chat room with other consumers. You are verbally and sexually harassed online by CSAM consumers, encouraged to commit suicide even. Anonymous people find you on social media, call you by your infamous given name of "Tara", and send you images of their genitalia or even images of you being sexually abused.

Imagine being known as "Tara," a label that you never chose yet have been haunted by as well the painful memories that are tied to it. You just want to break free from this title, which far so long has enslaved you.

Imagine being in high school, confiding in a trusted peer regarding your tainted childhood only for him to become jealous of your current dating relationship. He decides to create anonymous accounts on social media and sends CSAM of yourself to both you and your dating partner.

Imagine attending college and being notified by a close friend that a potential predator has contacted them in search of you. This individual tells your friend that they are a reporter and discloses your childhood trauma. They tell your friend that they know where you go to college and try to persuade your friend into sharing information about you. But your friend thankfully does not.

Imagine having panic attacks right before moving out on your own. You have never had these before, and you are quite surprised yet terrified due to feeling as if your throat is closing in and you are having a heart attack.

Imagine being in your 20s, undergoing counseling yet again because having a healthy relationship with a male seems nearly impossible due to the betrayal and sexual objectification you seem to have experienced since you were a young child. You ask yourself the question, "Will someone ever truly love me for who I am at the core — a soul — or will they just be infatuated with my flesh?"

Imagine desiring to have a family of your own someday, but you worry if the experiences from your childhood will endanger your own children. You fear that consumers of CSAM will target your children due to their disturbing obsession with you.

Imagine believing that in the future you must inform your children of your sexually exploitative childhood at some point early on, in hopes to prevent them from undergoing the torment that you went through.

Imagine feeling like you are constantly living in a hypervigilant state, always on the lookout for danger. You desire connection with others, yet you fear what lurks in the shadows, both in-person and online. What if they know you as "Tara?"

Imagine that images and videos of your sexual abuse are still circulating online throughout the world to this very day. You are revictimized every single time one of these images or videos is viewed, downloaded, or sent to another individual.

Imagine that you are a young adult in the process of finding yourself and trying to create a life that produces both joy and purpose. Despite the online sexual exploitation and negative effects that it has bestowed on your life, you are still trying to live, not to merely exist or survive but to thrive. This has been a challenge, but you refuse to give up.

Imagine you are me.

Sincerely,

**ADDENDUM TO THE PRESENTENCE REPORT**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**UNITED STATES V. GREGORY EDWARD MCLEAN**
**Docket No. 3:22-cr-115(S1)TJC-JBT**

The probation officer certifies the presentence report, and any subsequent revisions were disclosed to the defendant, the defendant's attorney, and counsel for the government.   The content of the addendum, which fairly states any objections made by counsel, also was disclosed to all parties.

**OBJECTIONS**

**By the Government**

The government has not submitted any objections to the presentence report or the application of the guidelines.

**By the Defendant**

The defendant has not submitted any objections to the presentence report or the application of the guidelines.

Respectfully Submitted,

Joseph C. Collins
Chief U.S. Probation Officer

*/s/ Irish Anderson*

By:   Irish Anderson
Senior United States Probation Officer

Approved:

*/s/ Amanda L. Henry*

Amanda L. Henry
Supervisory United States Probation Officer

March 11, 2024

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 106 of 160 PageID 473
Case 3:22-cr-00115-TJC-JBT  Document 45  Filed 02/13/24  Page 29 of 29 PageID 160
Case 3:22-cr-00115-TJC-JBT  Document 46  Filed 03/11/24  Page 31 of 31 PageID 191

MD/FL
Feb 2019

## POSITION OF THE PARTIES
## WITH RESPECT TO THE SENTENCING FACTORS

RE:  Gregory Edward McLean
Docket No. 3:22-cr-115(S1)TJC-JBT

The probation office is responsible for making a diligent effort to resolve any disputed issues raised by the parties.  In order to assist in the process, please complete and return this form to probation officer Irish Anderson, no later than the close of business on **February 27, 2024**.  If either party raises objections identified under Option III of this form, the probation officer will make a determination if a meeting of the parties is needed.  If so, the officer will contact the parties as soon as possible to arrange the meeting. The probation office will prepare an Addendum to the Presentence Report which will include the probation office's position on any unresolved objections that the parties have made to the report.

I.     No written objections are being made to the material information, sentencing classifications, sentencing guideline ranges, and policy statements contained in or omitted from the report.

Print Name: _____

Signature  : _____ Date:_____

II.    No written objection(s) to the material information, sentencing classifications, sentencing guideline ranges, and policy statements contained in or omitted from the report is (are) being submitted.   However we do wish to make the following points which are attached for the record (including 18 U.S.C. § 3553(a) factors and sentencing departure issues).

Print Name: _David Mesrobian_____

Signature  : _Paul m_____ Date: _2/27/24_____

III.   The attached objection(s) is (are) being made to the material information, sentencing classifications, sentencing guideline ranges, and/or policy statements contained in or omitted from the report.

Print Name: _____

Signature  : _____ Date:_____

cc: Opposing Counsel

This form will be provided to the court at the time the Presentence Report is disclosed.

# EXHIBIT D

**edovo**

**OFFICIAL TRANSCRIPT FOR:**

GREGORY MCLEAN

Mar 13, 2024 - May 7, 2024

Nassau County, FL

## Overview

| TOTAL LEARNING HOURS | COMPLETED COURSE HOURS | SUPPLEMENTAL LEARNING HOURS | COMPLETED COURSES |
|---|---|---|---|
| 73 | 62 | 11 | 14 |

## 14 Courses completed

| Course name | Overview | Time | Status |
|---|---|---|---|
| Michael G. Santos: Straight-A Guide | Acquire essential knowledge and skills from Michael G. Santos, a former prisoner who transformed his life through education and personal growth, empowering you to pursue a law-abiding future. | 12 hr 39 min | **Completed:** Apr 20, 2024 |
| Concepts in Biblical Interpretation Part I (BST… | Enhance your biblical study skills, interpretation techniques, and scriptural application for meaningful understanding. | 8 hr 47 min | **Completed:** Apr 24, 2024 |
| Foundations of Biblical Interpretation (BST 305.1 ) | Become equipped with essential principles and techniques for studying, interpreting, and applying Scriptures, fostering a deeper understanding and meaningful engagement with the Bible. | 8 hr 25 min | **Completed:** Apr 10, 2024 |
| Rising Strong: A Substance Use Recovery Course | Breaking free from substance use is a unique journey. With insights from experts, this course provides holistic options for substance use recovery, focusing on holistic well-being and self-awareness. | 6 hr 27 min | **Completed:** May 1, 2024 |
| MasterMind Course: Earning Freedom by Michael Santos | Gain valuable insights and guidance from Michael Santos's personal journey, leveraging his experiences to inspire personal transformation, reentry success, and a thriving future. | 5 hr 44 min | **Completed:** Apr 30, 2024 |
| Prison! My 8,344th Day (Video Version) | Gain valuable insights from Michael Santos' experience as a former prisoner, and learn deliberate strategies for personal growth and successful reintegration through the Prison! My 8,344th Day course. | 4 hr 53 min | **Completed:** May 3, 2024 |
| Thinking for the Future - CBT | Become empowered with practical tools and insights to cultivate positive thinking patterns, enhance emotional well-being, and foster meaningful behavioral changes for a brighter future. | 4 hr 22 min | **Completed:** Apr 25, 2024 |

**GREGORY's Learner ID:** 111741

**OFFICIAL TRANSCRIPT FOR:**
GREGORY MCLEAN

Mar 13, 2024 - May 7, 2024
Nassau County, FL

| Course name | Overview | Time | Status |
| --- | --- | --- | --- |
| Living Out Your Identity in Christ in a Sexualize Culture | A six session video bible study course helping you live out of your identity in Christ in a sexualized culture. | 2 hr 47 min | **Completed:** Apr 4, 2024 |
| Illegal to Legal: Business Success for the (Formerly)… | Gain the knowledge and skills to transition from illegal activities to legal entrepreneurship, providing opportunities for business success and personal transformation. | 2 hr 32 min | **Completed:** Apr 17, 2024 |
| A Guide Through the 12 Steps of Recovery | Gain insight into the impact of alcohol or substance use, explore the 12 steps of AA/NA, and engage in reflective exercises to support personal growth and recovery. | 2 hr 31 min | **Completed:** May 6, 2024 |
| Lessons for Christian Living | Build confidence in identity Reduce anxiety Promote integrity and character Gain strategies for managing temptations and decision-making Develop healthy habits and routines | 1 hr 25 min | **Completed:** May 6, 2024 |
| #1-Jesus the Christ-WELS-Prison Ministry | This course is provided by Wisconsin Evangelical Lutheran Synod's (WELS) Prison Ministry as a Bible study course. | 0 hr 49 min | **Completed:** May 5, 2024 |
| Introduction to the 2nd Opportunity Programs | This introductory series of courses is designed to provide employment readiness, life skills, and re-entry assistance to those who are currently incarcerated and seeking to change. | 0 hr 36 min | **Completed:** Apr 16, 2024 |
| PTSD For Veterans | Develop a comprehensive understanding of veteran PTSD, including symptoms, triggers, and treatment options, enabling individuals to recognize signs, and avoid triggers. | 0 hr 32 min | **Completed:** Mar 22, 2024 |

**OFFICIAL TRANSCRIPT FOR:**
## GREGORY MCLEAN

# Supplemental Learning - 10 hr 42 min

Summary

Listed below are the top **12** supplemental interactive learning items GREGORY has spent time on. In addition, GREGORY has engaged with **12 readings**, **30 learning videos**, and **15 audio recordings**.

| Title | Time |
|---|---|
| 09 Galatians | 3 hr 08 min |
| The Book of Acts (Chapters 13-28. Volume 2) | 2 hr 18 min |
| 16 2 Timothy | 1 hr 60 min |
| 10 Ephesians | 0 hr 58 min |
| Beyond Prison, Probation, and Parole | 0 hr 44 min |
| Transformed Discipleship | 0 hr 31 min |
| 11 Philippians | 0 hr 26 min |
| Bible Study IV - Galatians and Colossians | 0 hr 14 min |
| Book by Bill Corum - Nuggets of Gold | 0 hr 12 min |
| Prayer | 0 hr 08 min |
| Memorizing Scripture | 0 hr 03 min |
| The Foundations of Fitness | 0 hr 03 min |



# CERTIFICATE
## of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

## PTSD For Veterans

*in our Educational Curriculum*

03-22-2024

Date

President of JES



# CERTIFICATE
## of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

## Introduction to the 2nd Opportunity Programs

*in our Educational Curriculum*

04-16-2024
_____
Date

edovo

_____
President of JES



# CERTIFICATE
### of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

Michael G. Santos: Straight-A Guide

*in our Educational Curriculum*

04-20-2024

Date

President of JES



# CERTIFICATE
### of
### Completion

This Certificate is Proudly Presented to

## GREGORY MCLEAN

For completing

### Living Out Your Identity in Christ in a Sexualize Culture

in our Educational Curriculum

04-04-2024
Date

President of JES

edovo



# CERTIFICATE
### of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

## Foundations of Biblical Interpretation (BST 305.1)

*in our Educational Curriculum*

04-10-2024
—————————
Date

President of JES



# CERTIFICATE
### of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

## #1-Jesus the Christ-WELS-Prison Ministry

*in our Educational Curriculum*

05-05-2024
Date

President of JES



# CERTIFICATE
## of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

## A Guide Through the 12 Steps of Recovery

*in our Educational Curriculum*

05-06-2024
Date

President of JES

edovo



# CERTIFICATE
## of Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

### Thinking for the Future - CBT

*in our Educational Curriculum*

04-25-2024
_____
Date

_____
President of JES

edovo



CERTIFICATE

of
Completion

*This Certificate is Proudly Presented to*

GREGORY MCLEAN

*For completing*

Lessons for Christian Living

*in our Educational Curriculum*

05-06-2024

Date

President of JES

edovo



# CERTIFICATE
### of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

## Concepts in Biblical Interpretation Part I (BST 305.2)

*in our Educational Curriculum*

04-24-2024

Date

President of JES

edovo



# CERTIFICATE
## of
### Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

Illegal to Legal: Business Success for the (Formerly) Incarcerated

*in our Educational Curriculum*

04-17-2024
Date

President of JES

edovo



# CERTIFICATE
## of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

MasterMind Course: Earning Freedom by Michael Santos

*in our Educational Curriculum*

edovo

04-30-2024
_____
Date

_____
President of JES



# CERTIFICATE
## of
## Completion

This Certificate is Proudly Presented to

## GREGORY MCLEAN

For completing

## Rising Strong: A Substance Use Recovery Course

in our Educational Curriculum

edovo

05-01-2024
_____
Date

_____
President of JES



# CERTIFICATE
## of
## Completion

*This Certificate is Proudly Presented to*

## GREGORY MCLEAN

*For completing*

Prison! My 8,344th Day (Video Version)

*in our Educational Curriculum*

05-03-2024

Date

edovo

President of JES

# EXHIBIT E

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 126 of 160 PageID 493
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 1 of 35 PageID 126

1

```
              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                   JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Jacksonville, Florida

            Plaintiff,           Case No. 3:13-cr-106-J-32JRK

  vs.                            March 25, 2014

JOHN CHARLES STEVENSON,          11:02 a.m.

            Defendant.           Courtroom No. 10D
_____


                    SENTENCING HEARING
         BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
               UNITED STATES DISTRICT JUDGE


GOVERNMENT COUNSEL:

          D. RODNEY BROWN, ESQ.
          United States Attorney's Office
          300 North Hogan Street, Suite 700
          Jacksonville, Florida  32202


DEFENSE COUNSEL:

          LISA CALL, ESQ.
          Federal Public Defender's Office
          200 West Forsyth Street, Room 1240
          Jacksonville, Florida  32202


COURT REPORTER:

          Shannon M. Bishop, RDR, CRR
          221 North Hogan Street, #150
          Jacksonville, Florida 32202
          Telephone:  (904)549-1307
          dsmabishop@yahoo.com


(Proceedings recorded by mechanical stenography; transcript
produced by computer.)
```

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 127 of 160 PageID 494
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 2 of 35 PageID 127

2

```
 1                    P R O C E E D I N G S
 2    March 25, 2014                          11:02 a.m.
 3                          - - -
 4              COURT SECURITY OFFICER:  All rise.  The United States
 5    District Court in and for the Middle District of Florida is now
 6    in session.  The Honorable Timothy J. Corrigan presiding.
 7    Please be seated.
 8              THE COURT:  Good morning.  This is United States
 9    versus John Stevenson, 3:13-cr-106.  Mr. Brown represents the
10    government.  Ms. Call represents Mr. Stevenson, who's present
11    in the courtroom.
12              We're here today for the continuation of the
13    sentencing hearing in this case.  On February 19th, 2014, the
14    court conducted an extensive sentencing hearing with
15    Mr. Stevenson and all affected parties.
16              And the court -- although the official transcript of
17    that proceeding has not been prepared, the court has gone back
18    and reviewed the unofficial transcript in that case.  And so
19    all parties were heard and much discussion was had.
20              And at the end the court made sure that Mr. Stevenson
21    had had a chance to allocute, and then all -- then confirmed
22    with counsel that there was no legal bar to sentence in the
23    case.  The court then took the matter under advisement.
24              I did so because I wanted to perform a more
25    comprehensive review of the child pornography sentencing issues
```

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 128 of 160 PageID 495
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 3 of 35 PageID 128

3

1    that I've been confronted with over the last several years.

2         I had done that previously and -- but now new matters

3    keep being brought to my attention.  And I just wanted to take

4    a moment and go back and look at the learning and the wisdom

5    that I could pick up from the cases and other sources and try

6    to kind of see where -- where I wanted to -- how I wanted to

7    approach these cases, understanding that each case has to be

8    judged on its individual merits.  And by definition the 3553(a)

9    factors are going to have to be individually applied in

10   individual cases.

11        Nevertheless, it seemed to me that there were some

12   principles that I needed to either reaffirm in my own mind or

13   change my mind, depending upon my evaluation.  And so I took

14   the matter under advisement.

15        Let me just briefly state for the record the matters I

16   have reviewed other than cases and treatises and so forth.

17        But in terms of this case -- and I -- and this is

18   picked up from last time, as well, but I -- I got a -- of

19   course, I have the PSR.

20        I have the sentencing memorandum of Ms. Call.  I have

21   case law provided to me by Mr. Brown at the last hearing.  And

22   the sentencing memorandum by Ms. Call provided a couple of

23   letters from family members for Mr. Stevenson, which I

24   reviewed.  So I have looked at all that.

25        But in addition to that -- as I said, I wanted to go

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 129 of 160 PageID 496
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 4 of 35 PageID 129

4

1  and kind of look again at what the cases were saying and -- and

2  try to come up with an overview of how I would approach these

3  cases as we go forward, although I will have to say the

4  landscape keeps changing and -- you know, there's even bills in

5  Congress now on the minimum mandatories and so forth.

6        And who knows what will be the next chapter.  But at

7  least for now I wanted to kind of see where the law was and see

8  what my interpretation of it was and then pronounce sentence.

9        So this will take me a few minutes to do it.  And I

10  don't intend to do it in every case, but I want to do it in

11  this case, and then, at least to some extent, have these

12  principles carry forward in future sentencings that the court

13  is involved in.

14        As I begin -- for the most part, Mr. Stevenson's

15  case -- and this was acknowledged by Mr. Brown in his remarks

16  to me on February 19th.

17        And if I didn't specifically say so, I'm incorporating

18  the entire transcript of the February 19th hearing into this

19  hearing.

20        Mr. Brown told me -- this was a case that was similar

21  to the other cases that I have seen in this court that he's

22  brought, and some of his colleagues, involving the receipt of

23  child pornography -- possession and receipt of child

24  pornography.  And I tend to agree with that.

25        This is a -- to the extent that there is typicality,

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 130 of 160 PageID 497
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 5 of 35 PageID 130

5

1   this is a relatively typical type case.  And Mr. Brown, I

2   think, was helpful, explained to me some of the criteria

3   they -- they look at in how to charge these cases, and whether

4   to charge them and so forth.

5           And he and I have had discussions before about how you

6   decide whether to charge possession or receipt, because that

7   makes a big difference.  There's no minimum mandatory for

8   possession and there is for receipt.

9           But, in any event, the case was brought.  Receipt was

10  pled.  Mr. Stevenson pled guilty to it.  And so there is a

11  five-year minimum mandatory.

12          But in many respects it is similar to the types of

13  cases that I've been seeing over the last several years,

14  brought primarily by Mr. Brown, but others in his -- in his

15  office as well.

16          There are -- and so because of that, because this was

17  a relatively -- and I emphasize the term "relatively typical

18  case."

19          I thought it presented an opportunity for me to go

20  back and look and -- and kind of see what -- what learning I

21  could do.

22          Again, I've done -- you know, I've done this before.

23  And I continue to be informed by the parties over time.  But

24  I -- I thought a more comprehensive look was appropriate,

25  especially because -- obviously Ms. Call and Mr. Brown, both

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 131 of 160 PageID 498
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 6 of 35 PageID 131

6

1  good at what they do -- and both are able to cite authority and

2  principles that are -- that kind of would tend to send the

3  court one way or another.

4          And so I wanted to kind of get back in mind what

5  the -- what the analysis should be, at least from my point of

6  view.  And so I have done that.

7          And one of the things as we begin is that these

8  offenders -- these child pornography offenders generally either

9  face a range of zero to ten years statutorily, or, as in this

10 case, five years to 20 years, because this is a receipt case.

11         One of the things that -- especially in these minimum

12 mandatory cases, that is true, and I've thought about before,

13 because I -- I kept thinking, Why are these sentences -- why do

14 we have as much discussion about them as we do?

15         And I think there's lots of reasons.  But I think one

16 of the reasons is that unlike, for example, drug cases, or even

17 other cases -- and this is only one distinction, but it is one,

18 is that -- my experience has been -- is that relatively -- in

19 relatively few of these cases is the defendant given any type

20 of 5K consideration.

21         There's no safety valve.  There's nothing to relieve

22 the minimum mandatory or to reduce the guidelines exposure

23 based on cooperation or safety valve.

24         And I take it that that's -- the safety valve, of

25 course, would be -- would be by operation of law.  I take it

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 132 of 160 PageID 499
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 7 of 35 PageID 132

7

1  that the 5K is really because of the nature of the crime.

2         There may be just less opportunity for a defendant in

3  the situation of Mr. Stevenson to provide any information that

4  would be helpful to the government in prosecuting future cases.

5         And so I just point that out because it does make --

6  whatever the guideline sentence is is pretty much what the

7  guideline sentence is.  And it doesn't vary, as they do in

8  many, many of our other cases.

9         And that's not a blanket rule, but I'm not sure -- if

10  I've had a 5K in these series of cases, I don't remember it.

11  And I'm sure -- I'm sure Mr. Brown will remember if there was.

12         But, anyway, I think it's true that it just -- that

13  the guidelines tend to be what they are and they don't tend to

14  come down for any reason that they might in other cases.  So I

15  just think that's a truism here.

16         As currently structured, the guidelines provide for an

17  offense level of 22 in these cases, which is a relatively high

18  guideline to begin with, much, much higher than it was, for

19  example, in the mid-'90s, as my reading confirmed.

20         And, you know, that was a decision that was -- that

21  was made that this was -- the crime should be treated seriously

22  and -- because of its -- because of who the victims are -- that

23  is, the victims are children -- and because of the revulsion

24  that society feels for this type of activity, and certainly

25  Congressional policy as well.

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 133 of 160 PageID 500
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 8 of 35 PageID 133

8

1          So you start out with a 22, which is a relatively high

2     guideline base offense level.  And then, of course, what really

3     drives these cases is the enhancements.

4          And I won't belabor the record with what these

5     enhancements are, but -- but the criticism of them has been

6     that they apply in too many cases, or in almost all cases.

7          And so they're not really so much enhancements as they

8     are -- end up just being part of the base offense level of the

9     crime that are always going to be applicable.

10          But they -- when they combine with each other and the

11     22-level -- base offense level, they -- they raise the -- the

12     guideline ranges in almost all cases pretty high pretty quick.

13          And I'm looking at some -- this is not, of course,

14     determinative of what I would do.  But in a 2010 survey of

15     judges -- and this is according to United States Sentencing

16     Commission survey results, January 2010 through March of 2010,

17     69 percent of federal judges surveyed thought that the

18     guidelines for receipt of child pornography were too high.  70

19     percent said the guidelines for possession of child pornography

20     were too high.

21          And, again, you know, just because judges think

22     they're too high doesn't mean they are.  But that's a -- those

23     are pretty high numbers to get.

24          And I have other numbers that are -- that kind of bear

25     that out in the same time period, which is the period October

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 134 of 160 PageID 501
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 9 of 35 PageID 134

9

1   2012 to September 20 -- to September 30th of 2013, according to

2   the U.S. Sentencing Commission preliminary quarterly data

3   report, 2013, fourth quarter.

4        According to their numbers, 1605 defendants were

5   sentenced under 2G2.2.  Of those 1605 defendants, 491 were

6   sentenced to within the guideline range.

7        289 received some type of government-sponsored

8   reduction.  So that in some ways belies my earlier point, which

9   there's never a 5K.  I just haven't seen very many of them, I

10   guess.  804 otherwise received a below-guideline sentence.  And

11   21 defendants received an upward departure.

12        So of the 1605 sentenced defendants under this

13   guideline section, 500 were sentenced within the guidelines.

14   Most were below it, either because the government asked the

15   court to go below it or -- 804 were done by virtue of a ruling

16   by a district judge.  And so that's a significant number.

17        And it appears from the statistics that when judges do

18   depart in child pornography cases they do so in a fairly

19   substantial way, and the median decrease being 40 percent when

20   *Booker* or 3553(a) is cited, and 48 percent when it's not.  I'm

21   not sure why those two numbers are different, but -- but they

22   are.

23        And so that's just historically what's been happening

24   around the country.  And, of course, there's been a lot of

25   cases which have talked about this.

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 135 of 160 PageID 502
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 10 of 35 PageID 135

10

1    And Ms. Call cites most of them in her memorandum.

2  *United States versus Hanson*, 561 F.Supp. 1004, Eastern District

3  of Wisconsin, 2008.  Others from Eastern Wisconsin, Nebraska,

4  New Jersey.

5    And many -- and, of course, you can see by the numbers

6  that many federal judges do have concerns about how the

7  guidelines operate in these cases.

8    In the so-called -- I think the Supreme Court uses the

9  term "mine-run case," run-of-the-mill case.  But there is

10 contra authority.  And Mr. Brown was good to provide it to me.

11   *U.S. versus Cunningham* is probably the leading contra

12 authority.  Others, *U.S. v Riley*, from the Southern District --

13 and I'm going to talk about a couple of these cases in a

14 minute, because I think what this really shows is they depended

15 on their facts.

16   Even though the discussion was what it was, really,

17 when you got down to it, it kind of depended on the facts of

18 the case.

19   And according to, again, sentencing commission

20 statistics from 2012 -- and this is a 2012 publication.  In

21 2010, the two-level prepubescent minor enhancement applied in

22 96.1 percent of the cases.

23   The two-level enhancement for use of a computer

24 applied in 96.2 percent of the cases.  And 96.9 percent of the

25 cases included at least some enhancement for the quantity of

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 136 of 160 PageID 503
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 11 of 35 PageID 136

11

1  the images.  75 percent -- 74.2 percent included the four-level

2  enhancement for sadomasochistic images.

3          What that means when you look at it all, in the clear

4  majority of sentences at least ten-level enhancements were

5  applied, if not more.  And so there's that.

6          And, of course, as the *Cunningham* court points out --

7  and I'll talk about *Cunningham* in more detail in a minute.  You

8  know, the commission knew this when it did it.  Congress knew

9  it.  Congress was encouraging the commission to increase the

10  guidelines.

11          And so this is not something that's happened just by

12  chance or happenstance, but it does -- it has raised concerns

13  among many federal judges around the country when you get ready

14  to apply the guidelines in these cases as to whether you're

15  well-advised by them or not.

16          Then you get into arguments and discussions under

17  *Kimbrough* and *Rita* and the *Booker* cases.  How much deference

18  does the court give to the guidelines?  Can the court depart

19  just because of a policy disagreement with the guidelines, or

20  not?

21          The Eleventh Circuit has suggested that the farther

22  the departure or the variance from the guidelines the more

23  justification there has to be.  And that's, even now, still

24  evolving law.  But it makes the -- it makes the decision more

25  difficult.

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 137 of 160 PageID 504
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 12 of 35 PageID 137

12

1        I should remember -- I should mention another case,

2   which I'm not going to specifically discuss as I am the others

3   in a moment, but -- which is -- supports kind of Mr. Brown's

4   view of how the courts ought to approach the guidelines.

5        And that's *U.S. v Fiorella*, 602 F.Supp. 1057.  And

6   that's out of the Northern District of Iowa.  And also *U.S. v*

7   *Johnson,* 765 F.Supp.2d 779, Eastern District of Texas.

8        Some courts have commented, including the Second

9   Circuit in the *U.S. versus Dorvee*, that when most defendants

10  get the same enhancements there's little distinction between

11  the sentences for the typical offender and that for the most

12  dangerous offender.

13       And I'm not going to get into the comparison of other

14  guidelines and so forth.  I know Ms. Call does that in her

15  memorandum.  And I'm not really focused on that as much as she

16  was, but -- it's not a bad point, but I'm just not focused on

17  it.

18       And then I'll talk about the Eleventh Circuit in a

19  minute and its approach here, because I'm going to talk about

20  some specific cases just for a few minutes.

21       I do want to mention, too, that the sentencing

22  commission itself in 2002 -- 2012, excuse me, has published the

23  *United States Sentencing Commission: Report to Congress,*

24  *Federal Child Pornography Offenses.*

25       And in that report, which is, like, 400 pages, but --

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 138 of 160 PageID 505
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 13 of 35 PageID 138

13

1    I have the executive summary here.  But the sentencing

2    commission notes how often federal judges have been departing

3    or deviating, varying from the guidelines, and -- but also

4    offers some critique of the current guidelines.

5         So this is the sentencing commission offering critique

6    of its own guidelines.  And, for example -- and this is just

7    one quote -- they say, Third, as a result of recent changes in

8    the computer and Internet technologies that typically

9    non-production offenders use, the existing sentencing scheme in

10   non-production cases -- which is what we have here -- no longer

11   adequately distinguishes among offenders based on their degree

12   of culpability.

13        They also offer a critique of the number of images as

14   being perhaps out of balance, in terms of the way that they're

15   assessed.

16        And it goes on to say, As a result, four of the six

17   sentencing enhancements in 2G2.2, those relating to computer

18   usage and the type and volume of images possessed by offenders,

19   which together account for 13 offense levels, now apply to most

20   offenders, and, thus, fail to differentiate among offenders in

21   terms of their culpability.

22        Indeed -- and I'm skipping, but -- indeed, most of the

23   enhancements under -- or in 2G2.2, in their current or

24   antecedent versions, were promulgated when the typical offender

25   obtained child pornography in printed form in the mail.

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 139 of 160 PageID 506
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 14 of 35 PageID 139

14

1           And, again, this is a 400-page report.  And I'm not

2    trying to say that I've captured it.  There are actually

3    recommendations in here for increases in certain guidelines

4    in more aggravated cases, but there's also some recommendations

5    and concerns expressed that the current guidelines in

6    non-production cases are perhaps askew.

7           And this -- again, this is the sentencing commission

8    itself in 2012.  And, obviously, no action has yet been taken,

9    but I think it's an interesting addition to the learning.

10          Let me just talk briefly about a couple of these

11   cases, because I do think they are interesting.  They were

12   interesting to me.  I had read some of them before.  Some of

13   them I had not.

14          But I learned when I was first starting to practice

15   law that if you know the facts of the case, you very, very

16   often know what the results are going to be.  And I think these

17   cases are good examples of that.

18          Let's start with *U.S. versus Cunningham,* which is 680

19   F.Supp. 844.  This is the Eastern District -- Northern District

20   of Ohio, Eastern Division, case that Mr. Brown brought to my

21   attention.

22          And I cannot recall if I've read this case before or

23   not, but it's out of -- it's 2010.  And it does offer a

24   critique of those judges who have been critiquing the

25   guidelines, and offers a defense of the guidelines, offers a

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 140 of 160 PageID 507
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 15 of 35 PageID 140

15

1   rejection of this so-called Stabenow argument that was based on

2   a paper written by Mr. Stabenow, and, you know, offers a

3   reasoned approach to why -- to why these guidelines, even

4   though they're high, are appropriate.

5           And, you know, it's very well done and very well

6   reasoned, and -- but I wanted to point out two things about it.

7   One is that at the end -- and this is kind of the -- the bottom

8   line, In conclusion -- this is at page 855 of the opinion.

9           In conclusion, the court rejects any contention that

10  the guidelines should not be given deference.  However, the

11  court also notes that even if it were to disregard the

12  guidelines in their entirety, its sentence would not change;

13  that is, applying only the 3553(a) factors without deference to

14  the guidelines, the court would impose the identical sentence

15  detailed herein.

16          And so I think that's interesting.  First of all, of

17  course, I'm not proposing not to give the guidelines any

18  deference.  That's not really the -- I don't think it's an

19  either/or proposition.

20          But I think it's interesting in this *Cunningham* case

21  that Judge Adams said that he would have given the same

22  sentence regardless of what the guidelines said.  And in that

23  case he gave a 121-month sentence, which was, I think, low-end

24  guidelines time.

25          But one of the things that was very interesting to me

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 141 of 160 PageID 508
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 16 of 35 PageID 141

16

 1  as I read it -- when he's going through the 3553(a) factors, it
 2  turned out that in addition to being a receipt case, you could
 3  argue it was a production case.
 4          It says, Also seized from Cunningham's -- this is at
 5  page 858.
 6          Also seized from Cunningham's computer were images of
 7  a young girl, the niece of Cunningham's then girlfriend.
 8          And it talks about these pictures.  And he tried to
 9  say they were innocent and the court said they weren't.
10          And the court goes on to say, At some point in time
11  *Cunningham* found it appropriate to use a child in his life to
12  further his interest in child pornography.
13          Because what he was doing was taking these pictures
14  and sending them to his fellow travelers.  And, thus, the
15  circumstantial evidence -- and he talks about some of the file
16  names, which I won't repeat on the record.
17          But, thus, the circumstantial evidence strongly
18  supports that Cunningham was, at a minimum, using photographs
19  of a child he knew in order to build bonds with other
20  pedophiles and likely to obtain more child pornography in the
21  future.
22          Then they also talked about something that he sent out
23  about his younger sister, which I won't repeat.  And then he
24  himself actually created a video of himself.  And, again, it
25  was -- it's too gross to talk about out loud, but -- so, you

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 142 of 160 PageID 509
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 17 of 35 PageID 142

17

1   know, this was -- you know, this was kind of bad business.

2          And so when I say the facts inform the result, I think

3   this is a relatively aggravated case.  And the district judge

4   in that case did sentence Mr. Cunningham to 121 months, which I

5   believe was bottom of the guidelines.

6          And in *United States versus* -- and I say that because,

7   you know -- and this is not to compare -- it's not really

8   apples to apples.

9          But I recently had a case with Mr. Brown where the

10  individual, unfortunately, used his niece, if I recall

11  correctly, to produce some child pornography and then send it

12  to somebody else.  And, if I recall correctly, I sentenced that

13  individual to 20 years.  He had a 15-year minimum mandatory,

14  but...

15         And so, you know, I think we have made a

16  distinction -- I think the government has and the court has --

17  between production and victimization that's personal to the

18  so-called average collector or -- or a person who's

19  file-sharing but didn't have any role to play in actually

20  producing the child pornography ab initio.

21         And certainly in the *Cunningham* case that seemed to me

22  to be a pretty aggravated factor.  That was in addition to just

23  regular receipt of child pornography, by the way.

24         *U.S. versus Johnson*, 765 F.Supp. 779, I thought

25  offered a very well-reasoned defense of the guidelines.  And

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 143 of 160 PageID 510
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 18 of 35 PageID 143

18

1    the only quibble I would have with the case is that -- again,

2    it's put up as -- as being that -- the question being whether

3    the guidelines are entitled to no consideration or full

4    consideration.

5            And I don't think that's the choice.  I think -- I

6    think they have to be taken into account under *Booker* and they

7    have to be influential.  But how much account do you take into

8    them, I think is the -- is the question.  And it's not

9    either/or, as far as I'm concerned.

10           *U.S. versus Pugh* is an Eleventh Circuit case,

11   515 F.3d 1179, which Mr. Brown cited, and is -- you see cited

12   quite a bit.

13           And I had seen quotes from it before.  And I think I

14   had read it before, but I went back and read it again.  And,

15   again, the facts are so interesting and decisive in this case.

16   The guidelines were 97 to 121.  This was not a five-year

17   min-man case.

18           I believe this was just a possession case, although

19   it's hard to tell the difference sometimes, frankly.  But it

20   was.  It was a possession case.

21           So there was no five-year min-man, but there was a 97-

22   to 120-month imprisonment under the guidelines.  And the

23   district judge sentenced the defendant to five years of

24   probation.

25           Well, I could have told you that was going to get

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 144 of 160 PageID 511
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 19 of 35 PageID 144

19

 1   reversed.  And it did.  And the court goes through and -- and,

 2   certainly -- Mr. Brown cited it for the proposition, a fair --

 3   a fair cite, which is that the Eleventh Circuit, in the course

 4   of doing that, didn't seem to be having much trouble with the

 5   guidelines themselves.  They didn't seem to be questioning them

 6   or -- or saying that they were too high or anything like that,

 7   so -- so I take the point.

 8          But in terms of the facts of the case, you know, a

 9   probationary sentence in a child pornography case in the

10   Eleventh Circuit is pretty unlikely to be affirmed in almost

11   any circumstance.

12          One thing, though, that I thought was interesting,

13   they talked about -- the Eleventh Circuit, in the course of the

14   *Pugh* case, talked about how they have reversed other similar

15   cases, where the sentence just wasn't sufficient to the

16   situation.

17          But they also said, We have in some instances -- and

18   this is page 1202, 1203.

19          We have in some instances affirmed downward variances

20   in these kind of cases.  But in each of them substantial prison

21   sentences had been imposed.

22          And they cite these cases.  And the parentheticals

23   say, Affirming an 84-month sentence for distribution of child

24   pornography where the guidelines called for 151 to 188 -- which

25   I believe are the guidelines in this case -- affirming a

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 145 of 160 PageID 512
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 20 of 35 PageID 145

20

 1   120-month sentence for use of the Internet to entice a minor

 2   into sexual activity where the guidelines called for 135 to

 3   168, affirming a 72-month sentence for distribution of child

 4   pornography where the guidelines called for 151 to 188 months,

 5   affirming a 24-month sentence for possession of child

 6   pornography where guidelines called for 57 to 71 months.

 7           I just thought it was interesting that the Eleventh

 8   Circuit -- clearly in *Pugh* wasn't saying that you can't vary or

 9   that they haven't approved substantial variances in the past.

10           They were more saying, I think, that you can't give

11   probation in a typical case when the guidelines are 97 to 120

12   months.

13           So I think -- and, you know, that's kind of the case

14   that everybody cites, *Pugh,* as being the Eleventh Circuit's

15   case on this issue.  It was 2008.

16           There's been some since.  And Mr. Brown gave them to

17   me.  They were unpublished opinions, but -- and they affirmed

18   lengthy sentences and did not accept the idea that the

19   guidelines were fatally flawed.  So I take that point.

20           And then the last case I wanted to cite -- and then

21   I'll proceed to actually talk about Mr. Stevenson.

22           The last case I wanted to cite was one of the cases

23   which do not really believe the guidelines accurately reflect

24   what an appropriate sentence would be in the -- in the typical

25   situation.

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 146 of 160 PageID 513
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 21 of 35 PageID 146

21

1          And in this case -- it's *U.S. versus Grober* -- and
2    this is one of a number of district court cases from around the
3    country that are similar, but -- but I just want to use it for
4    one point, 595 F.Supp. 382.

5          And in that case the guidelines got up to 235 to 293.
6    And the district judge referred to that.  And the government
7    was asking for the 240 months, which was the statutory maximum.
8    And she noted he was a first offender and -- and, you know, it
9    was a fairly typical case.

10          And so I'm not -- I can't quite remember why the
11    guidelines got up as high as they did, but they did.  And she
12    called -- she says, quote, It is this staggering sentence that
13    the government is seeking, close quote.

14          But that's not why -- and then she gives a very long
15    and detailed discussion of the guidelines and 3553(a) and so
16    forth.  And I'm trying to remember what sentence she ended up
17    giving, but then I want to...

18          I think she went to the minimum mandatory.  She did.
19    So 60 months is what she gave.  But here's the point that I
20    want to make.  And I have said this before and I've said it in
21    context other than child pornography, but I -- I've never
22    really seen it written down before.  And I -- and I agree with
23    it.

24          It says, quote -- this is on page 412 of *U.S. versus
25    Grober* -- a sentence of five years for a first offender is a

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 147 of 160 PageID 514
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 22 of 35 PageID 147

22

1    substantial sentence.  Five years is not a slap on the wrist.

2    It is 260 weeks, 1825 days.  Anyone who thinks five years of

3    incarceration is a slap on the wrist has not visited a federal

4    prison lately.

5            And she actually has a footnote that says she visits

6    the federal prisons all the time.

7            Even under the most humane and enlightened conditions,

8    which are imperiled once fellow inmates learn about why a

9    downloader is serving time, five years is a significant loss of

10   liberty.

11           Moreover, after he serves his full 60 months,

12   Mr. Grober will be required to serve three years of supervised

13   release and register for life as a sex offender in New Jersey,

14   under Megan's Law.

15           A five-year sentence is on par with the average

16   sentences being imposed on child pornography offenders.

17   According to the December 2007 publication, the median sentence

18   is 63 months, which is up from 15 months in 1996.  That's a

19   four-fold increase in just ten years.  Congress' concerns are,

20   it appears, being met.

21           And I don't -- some of that's editorial, I suppose,

22   but I -- but the point I wanted to make is when we throw around

23   five-year minimum mandatory as the lowest sentence that

24   Mr. Stevenson can get, nobody can call that a slap on the wrist

25   in almost any crime.

Case 3:22-cr-00115-TJC-JBT Document 51 Filed 05/14/24 Page 148 of 160 PageID 515
Case 3:13-cr-00106-TJC-JRK Document 49 Filed 11/21/14 Page 23 of 35 PageID 148

23

 1          I suppose, you know, murder, probably, or something

 2    like that, but that's -- that's a long time.  And -- and I

 3    don't think we ought to ever forget it.

 4          So that's my review.  And I've looked at this

 5    carefully and I've tried to understand what people are saying,

 6    both those who are supporting the guidelines, so to speak, and

 7    those who are less enamored of them.

 8          You know, ultimately it's my job to find the

 9    guidelines -- which we've already all agreed are correct.

10    There's no question that they're correct in this case -- and

11    then to be advised by them and then to apply the 3553(a)

12    regimen to those guidelines and to the rest -- and to remaining

13    factors and come up with a sentence that is sufficient but not

14    greater than necessary.

15          So none of that discussion can do that for me.  But it

16    does help me to think about these cases, see what other judges

17    have done, see what other courts have done, see what the

18    Eleventh Circuit has said, see what the federal sentencing

19    commission has said, and is saying now.

20          Those are all things that at least I can put into the

21    mix and -- so that when I'm deciding how to be advised by the

22    guidelines I have a basis to do so.

23          Having said that, turning -- and so -- just so where

24    everybody is up to speed, we all agreed before that the

25    guidelines are correctly calculated at a total offense level of

Case 3:22-cr-00115-TJC-JBT Document 51 Filed 05/14/24 Page 149 of 160 PageID 516
Case 3:13-cr-00106-TJC-JRK Document 49 Filed 11/21/14 Page 24 of 35 PageID 149

24

1   34, a criminal history category of I, which is 151 to 188

2   months of imprisonment, five years to life of supervised

3   release, no restitution, 17,5- to $175,000 in fines, $100

4   special assessment.

5           Turning to the other 3553(a) factors and looking at

6   the nature and circumstance of the charged offense, serious

7   crime, involved the victimization of children, involves -- you

8   know, and there's no -- I know that -- Mr. Brown becomes

9   concerned sometimes that we don't -- we kind of are talking

10  about typical cases now, as opposed to remembering what we're

11  really talking about here. And I don't -- I don't forget. I

12  really don't.

13          And I do not take -- this is not a victimless crime,

14  in the sense that -- even though Mr. Stevenson himself didn't

15  produce the child pornography, he certainly partook of it,

16  and -- and there are indications, you know, that he -- there's

17  no question that it's disordered and deviant behavior.

18          And so I -- and Congress has made it clear that we as

19  a society cannot -- cannot have it. And so that's why the

20  penalties are what they are, even for first-time offenders.

21  And so I take the point.

22          By his admission, Mr. Stevenson says he was involved

23  in child pornography for about three years. I'm not sure the

24  government would have been able to prove that if he hadn't have

25  said it, but he did say it. And I -- that's probably right.

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 150 of 160 PageID 517
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 25 of 35 PageID 150

25

1   That's probably -- this wasn't something he just started the

2   day before the government showed up.

3          And I understand why we don't, but I wish I had a

4   psych report in the case.  I always feel better when I do,

5   but -- and so it's hard to evaluate things like whether

6   Mr. Stevenson presents any ongoing danger to children or what

7   the -- what the potential for recidivism is and so forth.

8          You know, you -- Mr. Brown says, How do we know he

9   won't?  And Ms. Call says, There's no evidence that he will or

10  that he has.  And, you know, I'm not capable really of knowing

11  the answer to that.

12         I will say there is no evidence, to my knowledge, of

13  any hands-on activity by Mr. Stevenson, even though he lived in

14  an environment where he -- he could have done that if he -- if

15  that was his predilection.

16         But I -- you know, we don't -- and even if we had a

17  psych report, you don't -- everybody is just having to do the

18  best they can to try to figure out -- I mean, there's no

19  question that it appears that sex offenders -- and

20  Mr. Stevenson, unfortunately, will now be one.

21         And I don't think -- I don't think of him as a

22  predator or a molester, because there's no evidence of that,

23  but he will be characterized as a sex offender.

24         And there doesn't seem to be any doubt that those --

25  those predilections are more difficult to treat and more

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 151 of 160 PageID 518
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 26 of 35 PageID 151

26

1  difficult to assure ourselves will not be repeated in the

2  future, at least that seems to be the state of the art right

3  now.

4       Hard to tell whether that's true of just viewing child

5  pornography or not.  I don't think we have really any good data

6  on that yet.

7       And I know I see different studies, but I've not

8  really been made aware of a -- of something that -- that I feel

9  like I know the answer to it.  And I'm not sure we ever will.

10      The quantity and conduct of the -- of the viewing and

11  the sharing and all that is relatively average, I guess, such

12  as these things go.

13      And when you look at Mr. -- you know, it wasn't a huge

14  number of images compared to some, but it was certainly enough

15  to get him bumped up on the guidelines.

16      The videos are disturbing, obviously, because those --

17  I think -- I think there's some thought that the videos are

18  even worse because they're -- they just are.

19      And so when you look at Mr. Stevenson's history and

20  characteristics, you know, you clearly see probably an alcohol

21  problem, probably a substance abuse problem.  You see

22  relatively limited employment.

23      I know he was a DJ in these establishments, at least

24  for the last several years.  And, you know, there's nothing

25  illegal about that.  It does, I suppose, lead one to wonder if

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 152 of 160 PageID 519
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 27 of 35 PageID 152

27

1   that kind of all fits together a little bit, and -- but no way
2   to really know.

3        I know his girlfriend -- or former girlfriend reported
4   that he seemed to be interested in younger women, but she was
5   talking about teenage women looking older.  And so I don't --
6   hard to know.

7        But it's -- Mr. Stevenson is a little different than
8   some of the others we've had, who you -- I think there is a
9   potential concern about where his predilections are and his
10  mind is, in terms of these issues.

11       And I certainly think he needs treatment.  And I don't
12  know whether he was asked the right question or not, but he --
13  he indicated to probation he didn't think he needed any
14  counseling.

15       And I -- that either shows a lack of insight or he
16  wasn't asked the right question.  I don't know which.  But I
17  certainly think he does need treatment and counseling.

18       There was some concern early on that he appeared to be
19  a little cavalier about this whole thing, with the agents and
20  so forth.  He's denied that.  But, you know, again, hard to --
21  hard to evaluate.

22       When I look at things like deterrence -- Mr. Brown
23  talks about that a lot.  And he's right.  You know, general
24  deterrence I hope -- I hope is starting to work.  I don't know.
25  We'll see.

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 153 of 160 PageID 520
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 28 of 35 PageID 153

28

1           You know, hopefully the word starts to get out that

2    this is -- you know, if you ever thought about doing this,

3    don't, because you're going to go to prison for at least five

4    years.  And, you know, hopefully that message will get out.

5           Specific deterrence and protecting the public, again,

6    I view Mr. Stevenson as a little bit of a question mark, in

7    terms of his future dangerousness.

8           It's just -- I don't -- I'm not able to say he is.

9    And I'm also not quite able to say he's not, I don't think,

10   based on the record in front of me, which admittedly is

11   imperfect.

12          I need to look at the kinds of sentences available.  I

13   need to provide him with correctional treatment.  And I need to

14   avoid unwarranted sentencing disparities among persons with

15   similar records who have been found guilty of similar conduct.

16          And with respect to the guidelines, my final comment

17   will be that -- I think that there's no question that the

18   guidelines and Congress' expressed intent in the law and its

19   intervention in the guidelines put upward pressure on the

20   sentences in these cases; that is, I think the guidelines are

21   influential, to the extent that they do counsel the court to

22   give longer sentences than the court might otherwise be

23   inclined to do if the guidelines were lower.  And so -- and I

24   think some of the cases have talked about that.

25          So even if the court doesn't, quote, follow the

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 154 of 160 PageID 521
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 29 of 35 PageID 154

29

1   guidelines by giving a sentence within the -- within the

2   guideline range, that doesn't mean the guidelines aren't

3   influential, and doesn't -- isn't an expression of sentencing

4   commission policy, Congressional policy, societal revulsion

5   over the crime.

6           And so I think -- I think that I am influenced by the

7   guidelines, to the extent that they do influence me to some

8   extent.  Even though I'm going to be deviating or varying from

9   them, that doesn't mean they didn't play a role in my

10  consideration.

11          So that's my effort to give my reasons in this case

12  and also my analysis of where we stand right now.  In future

13  cases I'm sure I won't take 50 minutes to do all that, but I

14  wanted to take the time to study it and now to put it on the

15  record in a way that -- if I had time to write these long

16  sentencing opinions like these other judges, I might do that,

17  but I just don't have time.  So this is -- this is the best I

18  can do.

19          Come on up, Mr. Stevenson, please.

20          Mr. Stevenson, on October 31st, 2013, you entered a

21  plea of guilty to Count Two of the indictment, charging you

22  with receipt of child pornography, in violation of 18, USC,

23  Section 2252(a)(2).

24          The court has previously accepted your guilty plea and

25  adjudged you guilty of that crime.  The court having heard from

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 155 of 160 PageID 522
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 30 of 35 PageID 155

30

1    all affected parties and being fully advised, it is the

2    judgment of this court that you be sentenced to the Bureau of

3    Prisons for a term of 84 months.

4         That 84-month period will be followed by a 20-year

5    term of supervised release.  However, I'm going to put an

6    automatic check on the supervised release every five years,

7    because the minimum is five.

8         And I want the probation office to take a look at

9    these long terms of supervised release every five years and

10   determine whether or not termination is a possibility of

11   supervised release, or at least some earlier ending point, but

12   the -- the maximum term will be 20 years, with five-year

13   checks.

14        While you're in the Bureau of Prisons, I'll recommend

15   you for sexual offender treatment.  I'll also recommend you for

16   substance abuse programming.  I'll also recommend you for

17   vocational and educational programming.

18        I saw in the presentence report you indicated you were

19   interested in some -- some career opportunities.  And I will

20   try to encourage the Bureau of Prisons to give those to you.

21        Ms. Call, I don't know whether you're -- you want to

22   request a location.  Do you want me to request Devens?  What do

23   you want me to do?

24        MS. CALL:  Actually, Your Honor, Mr. Stevenson plans

25   to return to his family in North Georgia.  So we wanted to ask

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 156 of 160 PageID 523
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 31 of 35 PageID 156

31

1  for Estill or Jesup.

2          THE COURT:  Okay.  I'll do that.  I don't know what

3  the -- what's the first one you said?

4          MS. CALL:  Estill, E-s-t-i- --

5          THE COURT:  Is that in South Carolina?

6          MS. CALL:  Yes.

7          THE COURT:  All right.  I'll do that.  I don't know

8  how that fits into the sexual offender treatment, but I'll go

9  ahead and recommend that.

10          The supervised release terms will be standard, plus

11  substance abuse programming, mental health programming

12  specializing in sexual offender treatment, and submitting to

13  polygraphing.  And we've got a standard paragraph we use for

14  that.

15          You'll be required to register as a sexual offender in

16  any state where it's required by law that you do so.

17          The probation officer will give your information to

18  the Florida officials and they'll register you here in this

19  state.

20          You cannot have direct contact with minors under the

21  age of 18 without written approval of your probation officer.

22  And you'll refrain from being where kids are congregating and

23  so forth.

24          You're prohibited from possessing, subscribing to, or

25  viewing any images or other materials of an explicit nature --

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 157 of 160 PageID 524
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 32 of 35 PageID 157

32

1    sexually explicit nature involving children.  You shall not

2    possess or use a computer with access to the Internet without

3    written approval from probation.

4          There's other conditions to that that are standard.

5    And I'm not going to take the time to read them all, but the --

6    I will include the standard provisions.

7          You'll submit to a search of your person, residence,

8    or place of business subject to -- upon reasonable suspicion,

9    subject to time, place, and manner, restrictions that are

10   appropriate to the situation.

11         DNA collection is required.  You can't use drugs.  And

12   you will be drug tested.  No fine.  $100 special assessment.

13         Sir, I am required by law to advise you of your right

14   to appeal from the judgment and sentence within 14 days,

15   consistent with your plea agreement.

16         Normally there's a limitation in your plea agreement.

17   But Ms. Call will advise you about whether you've got a basis

18   to appeal.  And if you decide to appeal, you must do so within

19   14 days from this date.

20         The government can also appeal.  And, of course, then

21   you would have to defend that appeal, and could also appeal

22   yourself, if you wanted to.

23         Ms. Call, or one of her partners, will continue to

24   represent you at no cost or charge to you during any appeal

25   proceedings.

Case 3:22-cr-00115-TJC-JBT   Document 51   Filed 05/14/24   Page 158 of 160 PageID 525
Case 3:13-cr-00106-TJC-JRK   Document 49   Filed 11/21/14   Page 33 of 35 PageID 158

33

1          Anything else, Parker?

2          PROBATION OFFICER:  I believe there's a dismissal of

3    Count One.

4          THE COURT:  Okay.  I'll dismiss Count One pursuant to

5    the plea agreement.

6          Anything else?

7          PROBATION OFFICER:  No.

8          THE COURT:  The court having pronounced sentence, I'll

9    entertain objections to the court's sentence or the manner in

10   which the court has pronounced sentence at this time.

11         MR. BROWN:  Your Honor, just for record purposes, we

12   would, of course, move for the third level, which is already

13   incorporated into the court's calculus.

14         We would also ask the court to affirm the preliminary

15   order of forfeiture, two computers, which is set forth in the

16   plea agreement, and also indicate that in the judgment, as

17   well.

18         And then, lastly, respectfully, the United States

19   would object to the court's sentence, at least the -- the

20   prison portion of it, as being unreasonable, because of the

21   substantial variance below the recommended guideline range.

22         THE COURT:  Yes, sir.  I do have the preliminary order

23   of forfeiture.

24         And there's no objection that, Ms. Call?

25         MS. CALL:  That is correct, Your Honor.  No objection

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 159 of 160 PageID 526
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 34 of 35 PageID 159

34

 1  to forfeiting the computers.

 2          THE COURT:  All right.  We'll include that in the

 3  judgment.

 4          Ms. Call, does Mr. Stevenson wish to lodge an

 5  objection to the court's sentence or the manner in which the

 6  court has pronounced sentence at this time?

 7          MS. CALL:  No, Your Honor.

 8          THE COURT:  Okay.  All right.  Sir, this is the way it

 9  is.  And, you know, the only thing I can say to you is you need

10  to take advantage of the treatment, you need to take advantage

11  of the opportunities.

12          When you get out, you're going to have to make a life

13  for yourself.  And you can do that, but it's going to be hard.

14  But I do wish you well and I wish your family well.  And the

15  marshals will be taking custody of you now.

16          Good luck to you, sir.

17          We're in recess.

18          COURT SECURITY OFFICER:  All rise.

19      (The proceedings concluded at 11:55 a.m.)

20                      - - -

21

22

23

24

25

Case 3:22-cr-00115-TJC-JBT  Document 51  Filed 05/14/24  Page 160 of 160 PageID 527
Case 3:13-cr-00106-TJC-JRK  Document 49  Filed 11/21/14  Page 35 of 35 PageID 160

35

## CERTIFICATE

UNITED STATES DISTRICT COURT          )
                                                         )
MIDDLE DISTRICT OF FLORIDA            )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


      DATED this 21st day of November, 2014.




      s/Shannon M. Bishop
      Shannon M. Bishop, RDR, CRR